[No. 82154-2. En Banc.]

Argued June 30, 2009.    Decided February 18, 2010.

THE STATE OF WASHINGTON, *Respondent,* v. CHRISTOPHER WILLIAM SIEYES, *Appellant.*

278

*Thomas E. Weaver Jr.*, for appellant.

*Russell D. Hauge, Prosecuting Attorney*, and *Todd L. Dowell, Deputy*, for respondent.

*Neil M. Fox* and *Sheryl G. McCloud* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae.

¶1 SANDERS, J. — Law enforcement officers arrested 17-year-old Christopher Sieyes for possessing a loaded .380 semiautomatic handgun. The trial court found Sieyes guilty of unlawful possession of a firearm under RCW 9.41-.040(2)(a)(iii),[1] which limits circumstances in which children under age 18 can lawfully possess firearms. We must decide whether the Second Amendment to the United States Constitution applies to the states and, if so, determine whether RCW 9.41.040(2)(a)(iii) unconstitutionally infringes on the right to bear arms protected by either the United States or Washington Constitutions. We hold the

---

[1] "A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under subsection (1) of this section for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm: . . . [i]f the person is under eighteen years of age, except as provided in RCW 9.41.042." RCW 9.41.042 enumerates nine exceptions which allow children under age 18 to possess firearms.

Second Amendment applies to the states via the Fourteenth Amendment due process clause; however, Sieyes fails to demonstrate on this record that RCW 9.41.040(2)(a)(iii) infringes on his right to bear arms under either constitution.

## FACTS

¶2 In April 2007 Kitsap County Deputy Sheriff Jon Vangesen stopped a car for speeding. Vangesen observed front-seat passenger Christopher Sieyes, then 17 years of age, make a "furtive movement" toward the front passenger floorboard. After Sieyes stepped out of the car at Vangesen's instruction, the deputy sheriff found a loaded Bursa .380 semiautomatic handgun under Sieyes's seat. He arrested Sieyes and transported him to a juvenile detention facility. Vangesen later testified the handgun was accessible to Sieyes but not other car passengers.

¶3 In October 2007 the trial court found Sieyes guilty of second degree firearm possession because he constructively possessed a handgun and did not meet any exception under RCW 9.41.042 permitting children to possess firearms. The court sentenced Sieyes to 10 days' juvenile detention, 1 year of supervision, 30 hours of community service, and a $100 fine.

¶4 Sieyes appealed to the Court of Appeals, Division Two, arguing (1) the evidence was insufficient to convict him, (2) the trial court erred by not concluding his possession was "knowing," and (3) the State should have proved the statutory exceptions allowing children to possess firearms did not apply to Sieyes.[2] Sieyes also mentioned RCW 9.41.040(2)(a)(iii) was "an absolute prohibition on firearm

---

[2] The exceptions include (1) hunting or firearms safety courses; (2) target shooting at an authorized range; (3) organized competitions; (4) hunting with a valid license; (5) legally in an area where firearm discharge is permitted and either (a) at least 14 with a valid hunter safety certificate and using a lawful firearm other than a pistol or (b) under parent, guardian, or approved-adult supervision; (6) traveling with unloaded firearm to engage in authorized activity; (7) being on parent, guardian, or relative's real property and having permission to

possession by minors" and therefore violated his constitutional right to bear arms. Appellant's Suppl. Br. at 10 (Wash. Ct. App. No. 36799-8-II).

¶5 In July 2008 the Court of Appeals requested supplemental briefing on the constitutionality of the statute and the effect of *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), which held the Second Amendment confers an individual right to keep and bear arms. We transferred the instant matter to this court pursuant to RAP 4.4 solely on the issue of the statute's constitutionality and the effect of *Heller*.[3]

## ISSUES

¶6 We must determine whether the Second Amendment's right to bear arms applies to the states as part of the process due under the Fourteenth Amendment and, if so, whether RCW 9.41.040(2)(a)(iii) unconstitutionally infringes on that right. We also independently examine whether the statute violates article I, section 24 of our state constitution.

## STANDARD OF REVIEW

■ ¶7 We review issues of constitutionality de novo. *State v. Chavez*, 163 Wn.2d 262, 267, 180 P.3d 1250 (2008) (citing *State v. Eckblad*, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004)).

---

possess firearm; (8) being at his or her residence and having parent or guardian's permission to possess firearm; or (9) when on military duty. RCW 9.41.042.

[3] While the order transferring this case did not explicitly limit our review, the Court of Appeals certified only this issue. We therefore decide only whether RCW 9.41.040(2)(a)(iii) unconstitutionally infringes on the right to bear arms, and we remand for further proceedings on the remaining issues, which include (1) the trial court's finding of fact regarding accessibility of the firearm, (2) evidence establishing Sieyes's constructive possession of the gun, and (3) existence or absence of exceptions in RCW 9.41.042.

## ANALYSIS

I. The United States Constitution Safeguards an Individual Right To Bear Arms and Applies to the States via the Fourteenth Amendment Due Process Clause

■ ¶8 The Second Amendment provides, "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. The United States Supreme Court had not clarified whether the Second Amendment's right to keep and bear arms was an individual entitlement until *Heller*, the Court's "first in-depth examination of the Second Amendment." *Heller*, 554 U.S. at 635. *Heller* unquestionably recognized an individual right to bear arms and, in the process, rejected a collective right conditioned on militia service. "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited, just as the First Amendment's right of free speech was not." *Id.* at 595. We must answer whether the Second Amendment applies to the states—an issue *Heller* explicitly sidestepped. *Id.* at 620 n.23.

■ ¶9 Incorporation is "[t]he process of applying the provisions of the Bill of Rights to the states by interpreting the 14th Amendment's Due Process Clause as encompassing those provisions." BLACK'S LAW DICTIONARY 834 (9th ed. 2009). The Fourteenth Amendment bars "any state [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Under the original constitutional architecture, the federal Bill of Rights protected only enumerated rights from federal interference. *Barron v. Mayor of Balt.*, 32 U.S. (7 Pet.) 243, 247-51, 8 L. Ed. 672 (1833) (Marshall, C.J.). Today, however, the Supreme Court has applied nearly the entire Bill of Rights to the states through the due process clause. *Duncan v. Louisiana*, 391 U.S. 145, 149, 88

S. Ct. 1444, 20 L. Ed. 2d 491 (1968). Since 1897 the Supreme Court has progressively concluded most liberties protected by the Bill of Rights are incorporated. *See, e.g., Chi., Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897) (holding due process clause prevents states from taking property without just compensation); *Gitlow v. People of New York*, 268 U.S. 652, 45 S. Ct. 625, 69 L. Ed. 1138 (1925) (incorporating First Amendment protection of free speech); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940) (incorporating First Amendment protection of free exercise of religion).[4] At this writing incorporation of the Bill of Rights to the states through the Fourteenth Amendment is "virtually" complete. *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 34, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991) (Scalia, J., concurring).[5]

¶10 The early test for incorporation was whether the right was a "fundamental principle of liberty and justice which adheres in the very idea of free government." *Twining v. New Jersey*, 211 U.S. 78, 106, 29 S. Ct. 14, 53 L. Ed. 97 (1908), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Justice Cardozo later narrowed this test to incorporate rights only if it would be "impossible" to maintain "a fair and enlightened system of justice" without them. *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 82 L. Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S.

---

[4] As the Court incorporated additional provisions the justices debated whether the Bill of Rights should apply en banc. Justice Black argued the Fourteenth Amendment incorporated all provisions in the Bill of Rights and applied them to the states. *Adamson v. California*, 332 U.S. 46, 68, 67 S. Ct. 1672, 91 L. Ed. 1903 (1947) (Black, J., dissenting), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). But Justice Frankfurter argued selective incorporation included only rights necessary to assure a scheme of ordered liberty. *Id.* at 59 (Frankfurter, J., concurring). The debate continued for decades. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 541, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (plurality) (White, J., dissenting).

[5] As of 2006 the Court had explicitly applied 20 of 25 Bill of Rights provisions to the states. Erwin Chemerinsky, Constitutional Law: Principles and Policies 503-05 (3d ed. 2006).

784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).[6] Today's more-permissive standard incorporates rights "fundamental to the American scheme of justice," *Duncan*, 391 U.S. at 149, that is, "necessary to an Anglo-American regime of ordered liberty." *Id.* at 149 n.14. *Duncan* weighs four factors to determine whether a Bill of Rights provision warrants incorporation: (1) the right's historical underpinning; (2) states' initial regard for the right, particularly in state constitutions; (3) recent trends and popular view regarding the right; and (4) purpose served by the right. *Id.* at 149-58.

¶11 Although the *Heller* Court did not expressly consider incorporation of the right to bear arms, "that need not stop the rest of us." Sanford Levinson, Comment, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 653-54 (1989). Lower courts need not wait for the Supreme Court to apply *Duncan*; the Constitution is the rule of all courts— both state and federal judiciaries wield power to strike down unconstitutional government acts.[7] U.S. CONST. art. VI, cl. 2; Nelson Lund, *Anticipating Second Amendment Incorporation: The Role of the Inferior Courts*, 59 SYRACUSE L. REV. 185 (2008). We must ourselves determine whether the Second Amendment is incorporated.

¶12 The first *Duncan* factor demands historical analysis of the right to bear arms, with special attention to fundamental rights " 'deeply rooted in this Nation's history and tradition.' " *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L. Ed. 531 (1977) (plurality)). Gun ownership is an inexorable birthright of American tradition. "Americans who participated in the Revolution of 1776 and adopted the Bill of Rights held the individual right to have and use arms

---

[6] *Palko* also established the Court's selective incorporation theory.

[7] On September 30, 2009 the United States Supreme Court granted certiorari in *McDonald v. City of Chicago*, a case directly examining incorporation of the Second Amendment via the Fourteenth Amendment. *Cert. granted*, 130 S. Ct. 48 (Sept. 30, 2009) (No. 08-1521).

against tyranny to be fundamental."[8] STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED: THE EVOLUTION OF A CONSTITUTIONAL RIGHT 55 (1984). Moreover gun ownership was a universal legal duty of American colonists. Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285, 290-95 (1983).

¶13 *Heller* analyzed the Second Amendment from pre-ratification to the end of the 19th Century, concluding the right to bear arms is an individual right. The Court began by noting the 1689 Declaration of Rights included the right to bear arms. *Heller*, 554 U.S. at 593. The Court added that Blackstone, " 'the preeminent authority on English law for the founding generation,' " *id.* at 593-94 (quoting *Alden v. Maine*, 527 U.S. 706, 715, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999)), considered the right to bear arms "a public allowance, under due restrictions, of the natural right of resistance and self-preservation," 1 WILLIAM BLACKSTONE, COMMENTARIES 144 (2d ed. 1766). The right to bear arms therefore flows from the "absolute rights" of "personal security, personal liberty, and private property." *Id.* at 140-41. *The Federalist No. 46* describes "the advantage of being armed, which the Americans possess over the people of almost every other nation" from the viewpoint of a fundamental right to self-defense. THE FEDERALIST No. 46, at 296 (James Madison) (Clinton Rossiter ed., 2003). "By the time of the founding, the right to have arms had become fundamental for English subjects." *Heller*, 554 U.S. at 593. *Heller* severed the right to bear arms from service in a militia, foreclosing the only plausible argument against finding the right to be individual. 554 U.S. 570.

¶14 *Heller* also found universal support for an individual right to bear arms in pre-Civil War case law and commentary. *Id.* at 611 (quoting *Aldridge v. Commonwealth*, 4 Va. (2

---

[8] The English settled America with the understanding they would possess "all the rights of natural subjects" including gun ownership. JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 137-40 (1994) (internal quotation marks omitted) (citing SAMUEL ELIOT MORISON, THE OXFORD HISTORY OF THE AMERICAN PEOPLE (1972)). "[T]his country was *founded* by religious nuts with guns." P. J. O'ROURKE, AGE AND GUILE BEAT YOUTH, INNOCENCE, AND A BAD HAIRCUT 228 (1995).

Va. Cas.) 447, 449 (1824)). The most important early American editor of *Blackstone's Commentaries* called the right to bear arms the "true palladium of liberty." 1 WILLIAM BLACKSTONE, COMMENTARIES ed.'s app. note D at *300 (St. George Tucker ed. 1803) ("of the Constitution of the United States"). Thirteen of the 23 states admitted to the Union had Second Amendment analogues by 1820. *Heller*, 554 U.S. at 600-03.[9]

¶15 The *Heller* Court also analyzed post-Civil War case law and commentary to conclude a key purpose of the Fourteenth Amendment was to ensure freed blacks had the right to keep and bear arms. *Id.* at 614-16; *see generally* STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876 (1998). The Fourteenth Amendment "transcended race and region, it challenged legal discrimination throughout the nation and changed and broadened the meaning of freedom for all Americans." ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION, 1863-1877, at 257-58 (1988); *see also* AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 390-91 (2005).

¶16 Indeed reconstruction Republicans sought to empower black freedmen to resist oppression at the hands of resurgent white supremacists in the South. *Heller*, 554 U.S. at 615 (citing congressional findings as reported in *The Local Georgian*, a weekly newspaper, that " '[a]ll men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves' " (alteration in original)). " 'The right to bear arms has always been the distinctive privilege of freemen. Aside from any necessity of self-protection to the person, it represents among all nations power coupled with the exercise of a certain jurisdiction.' " *Id.* at 619 (quoting JOHN ORDRONAUX, CONSTITUTIONAL LEGISLATION IN THE UNITED STATES 241 (1891)).

---

[9] Today 44 states have constitutional rights to bear arms. Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. L. & POL. 191, 192 (2006).

¶17 Accordingly we regard the history, lineage, and pedigree of the Second Amendment right to bear arms necessary to an Anglo-American regime of ordered liberty and fundamental to the American scheme of justice. It is deeply rooted in this Nation's history and tradition.

¶18 The second *Duncan* factor calls for states' historical consideration of the right to bear arms. 391 U.S. at 153-54. Certainly our state constitution, like many others, guarantees an individual right to bear arms. Article I, section 24 of the Washington Constitution declares, "**RIGHT TO BEAR ARMS.** The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men." *Heller* confirms the right to bear arms is an individual right. While textually different from the Second Amendment, many state analogs nonetheless reveal a similar sentiment—as ours certainly does.

¶19 Forty-four state constitutions explicitly recognize the right to keep and bear arms and "[n]early all secure (at least in part) an individual right to keep some kinds of guns for self-defense." Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 192 (2006); *see also* Clayton E. Cramer, For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right To Keep and Bear Arms 221-67 (1994). The right was considered essential in the colonies and by the original states. Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 139 (1994). "Despite a diversity of colonial settings, each with its 'richly textured pattern of legal institutions and activity,' the approach to private arms ownership and the employment of an armed citizenry was remarkably uniform from colony to colony." *Id*. at 138-39 (quoting Kermit L. Hall, The Magic Mirror: Law in American History 14 (1989)). "The dangers all the colonies faced . . . were so great that not only militia members but all householders were ordered to be armed." *Id*. at 139.

¶20 Third under *Duncan*, whether the right "continues to receive strong support" today focuses on whether recent precedent forecloses incorporation. *Duncan*, 391 U.S. at 154. In *United States v. Cruikshank*, 92 U.S. (2 Otto) 542, 23 L. Ed. 588 (1875) and *Presser v. Illinois*, 116 U.S. 252, 6 S. Ct. 580, 29 L. Ed. 615 (1886), the United States Supreme Court declined to apply the Second Amendment to the states because the *Slaughter-House Cases*, 83 U.S. (16 Wall) 36, 21 L. Ed. 394 (1872), precluded the application of the Bill of Rights to the states via the privileges and immunities clause, not the due process clause.[10] Moreover these precedents did not foreclose incorporation because each predated selective incorporation, first articulated in 1897. *See Chi., Burlington & Quincy R.R.*, 166 U.S. 226. Thus we decline to rely on these cases for the proposition that the Second Amendment is not an expression of part of the process due every person by state government.

> The first "incorporation decision," *Chicago, B. & Q. R. Co. v. Chicago*, was not delivered until eleven years after *Presser*; one therefore cannot know if the judges in *Cruikshank* and *Presser* were willing to concede that *any* of the amendments comprising the Bill of Rights were anything more than limitations on congressional or other national power.

Levinson, *supra*, at 653 (footnote omitted); William Van Alstyne, *The Second Amendment and the Personal Right to Arms*, 43 Duke L.J. 1236, 1239 n.10 (1994); *accord Heller*, 554 U.S. at 620 n.23 (noting, "*Cruikshank* . . . did not engage in the sort of Fourteenth Amendment inquiry required by our later cases"). Moreover *Cruikshank* merely held the federal Constitution does not apply to private individuals: "The only obligation resting upon the United States is to see that the states do not deny the right. This the [Fourteenth] amendment guarantees, but no more. The power of the national government is limited to the enforcement of this guaranty." 92 U.S. at 554-55. Courts that rely

---

[10] The Court also addressed Second Amendment incorporation very briefly in *Miller v. Texas*, 153 U.S. 535, 538, 14 S. Ct. 874, 38 L. Ed. 812 (1894), but dismissed the case on procedural grounds without showing its incorporation hand.

on this precedent misunderstand its holding.[11] Because *Cruikshank* and *Presser* predate the Supreme Court's process of selectively applying the Bill of Rights to the states under *Duncan*, they cannot impede the current incorporation doctrine.

¶21 Nevertheless in early 2009 the Second Circuit puzzlingly and reluctantly relied on *Presser* to reject incorporation. *Maloney v. Cuomo*, 554 F.3d 56 (2d Cir. 2009).[12] In a per curiam opinion the court stated it was forced to follow *Presser* because " 'the Court of Appeals should follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions.' " *Id.* at 59 (internal quotation marks omitted) (quoting *Bach v. Pataki*, 408 F.3d 75, 86 (2d Cir. 2005)). Again *Presser* predates the incorporation doctrine and "said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations." *Heller*, 554 U.S. at 621. *Presser* cannot directly control when the issue is the very reach of incorporation under the due process clause—a doctrine it never addressed. Moreover *Maloney* upheld New York's ban on martial arts "nunchaku"[13] based on "rational basis" review, a standard specifically rejected by the Supreme Court in *Heller*. *Id.* at 628 n.27; *cf. Maloney*, 554 F.3d at 59.

¶22 The Seventh Circuit Court of Appeals recently labeled *Cruikshank*, *Presser*, and *Miller v. Texas*, 153 U.S.

---

[11] Lower courts have generally upheld state and local gun control laws by citing the obsolete reasoning in *Presser* and *Cruikshank* for the proposition that the Second Amendment does not apply to the states. *See* Michael Anthony Lawrence, *Second Amendment Incorporation through the Fourteenth Amendment Privileges or Immunities and Due Process Clauses*, 72 Mo. L. Rev. 1, 57 (2007).

[12] James Maloney filed for certiorari to the United States Supreme Court on June 26, 2009 ( *petition for cert. filed*, 78 U.S.L.W. 3015 (U.S. June 26, 2009) (No. 08-1592)). As of this writing the Court has not acted on the petition.

13
"[A]ny device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking."

*Maloney*, 554 F.3d at 58 (quoting N.Y. Penal Law § 265.00(14)).

535, 14 S. Ct. 874, 38 L. Ed. 812 (1894), "obsolete" and "defunct." *Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago*, 567 F.3d 856, 857-58 (7th Cir.), *cert. granted*, 130 S. Ct. 48 (2009). Nevertheless the court followed *Maloney* to not apply the Second Amendment to the states through the Fourteenth Amendment privileges and immunities clause. The Seventh Circuit felt its hands tied by Supreme Court holdings "even if the reasoning in later opinions has undermined their rationale." *Id.* at 857.

¶23 On the other hand a three-judge panel of the Ninth Circuit recently abandoned *Cruikshank, Presser,* and *Miller v. Texas* as obsolete. *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) (*Nordyke* I). But on July 29, 2009 the court voted to rehear the matter en banc. Although it cannot be cited as precedent "by or to any court of the Ninth Circuit," *Nordyke v. King*, 575 F.3d 890, 891 (9th Cir. 2009) (*Nordyke* II), the panel decision persuasively applied the Second Amendment to the states via the due process clause. "The crucial role this deeply rooted right [to keep and bear arms] has played in our birth and history compels us to recognize that it is indeed fundamental, that it is necessary to the Anglo-American conception of ordered liberty that we have inherited." *Nordyke* I, 563 F.3d at 457.[14] While *Nordyke* enjoys no precedential value, it nonetheless contributes to *Duncan*'s third prong by signaling courts' current interpretation of the Second Amendment.

¶24 Notwithstanding *Heller* the United States Supreme Court's most recent in-depth examination of the Second Amendment occurred in *United States v. Miller*, 307 U.S. 174, 59 S. Ct. 816, 83 L. Ed. 1206 (1939). Like *Presser* and *Cruikshank* we question the relevance of *United States v. Miller* to the instant matter, albeit for different reasons. *Miller* concerned the constitutionality of a federal regulation barring interstate transport of, for example, an unregistered sawed-off shotgun. The Court upheld the federal

---

[14] In the same vein recent trends and popular views among state attorneys general favor incorporation. At least 34 state attorneys general have signed amicus briefs in *McDonald* supporting incorporation. *See* 130 S. Ct. 48.

regulation, stating, "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178. *Miller*'s holding stands for the proposition—and little more—that certain types of weapons are not linked to militia service. *See Heller*, 554 U.S. at 622; Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48, 75-77 (2008). Accordingly *United States v. Miller* does not touch the instant matter.

¶25  Lastly, the purpose served by the right to bear arms supports incorporation. *Heller* made plain the Second Amendment's grammatical structure; its text is comprised of prefatory and operative clauses. *Heller*, 554 U.S. at 577. "The former does not limit the latter grammatically, but rather announces a *purpose.*" *Id.* (emphasis added). Namely, the amendment's purpose is " 'the security of a free State.' " *Id.* (quoting U.S. Const. amend. II). This broad concept encompasses at least two prongs: (1) protection against governmental or military tyranny and (2) self-protection. *See, e.g.*, William C. Plouffe, Jr., *A Federal Court Holds the Second Amendment is an Individual Right: Jeffersonian Utopia or Apocalypse Now?*, 30 U. Mem. L. Rev. 55, 87-89 (1999); Scott Bursor, Note, *Toward a Functional Framework for Interpreting the Second Amendment*, 74 Tex. L. Rev. 1125, 1134-37 (1996). While the latter arguably finds more relevance today, both underlie the Second Amendment and support its application to the states.

¶26  Pursuant to *Duncan* the Second Amendment protects an individual right to bear arms from state interference through the due process clause of the Fourteenth Amendment. This right is necessary to an Anglo-American regime of ordered liberty and fundamental to the American scheme of justice.

## II. Article I, Section 24 of the Washington Constitution Also Secures the Individual Right To Keep and Bear Arms

¶27 Article I, section 24[15] plainly guarantees an individual right to bear arms. "[T]here is quite explicit language about the 'right of the individual citizen to bear arms in defense of himself.' This means what it says. From time to time, people in the West had to use their weapons to defend themselves and were not interested in being disarmed." Hugh Spitzer, *Bearing Arms in Washington State* 9 (Proceedings of the Spring Conference, Washington State Association of Municipal Attorneys (Apr. 24, 1997)).

■ ¶28 We have noted the individual right to bear arms under article I, section 24 may be broader than the Second Amendment but had not yet determined our provision's distant reaches when the Court decided *Heller. See City of Seattle v. Montana*, 129 Wn.2d 583, 594, 919 P.2d 1218 (1996) (plurality); *State v. Rupe*, 101 Wn.2d 664, 706, 683 P.2d 571 (1984).[16] Supreme Court application of the United States Constitution establishes a floor below which state courts cannot go to protect individual rights. But states of course can raise the ceiling to afford greater protections under their own constitutions. Washington retains the " 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.' " *State v. Gunwall*, 106 Wn.2d 54, 59, 720 P.2d 808 (1986) (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980)).

---

[15] **RIGHT TO BEAR ARMS.** The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

[16] In *Rupe* we suggested article I, section 24 "is facially broader than the Second Amendment, which restricts its reference to 'a well regulated militia.' " *Rupe*, 101 Wn.2d at 706.

¶29 Two textual exceptions qualify the scope of the right to keep and bear arms in the Washington Constitution. First, the right exists only in the context of an individual's "defense of himself, or the state." CONST. art. I, § 24. Second, the right does not authorize "individuals or corporations to organize, maintain or employ an armed body of men." *Id.*

¶30 In Washington the police power is subject to all the rights specified in our Declaration of Rights, including the constitutional right of the individual citizen to keep and bear arms. We are not at liberty to disregard this text: "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." CONST. art. I, § 29. Moreover, the mandatory provision in article I, section 24 is strengthened by its two textual exceptions to the otherwise textually absolute right to keep and bear arms. Robert F. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. PUGET SOUND L. REV. 491, 509-10 (1984) (explaining, "[T]he express mention of one thing in a constitution implies the exclusion of things not mentioned").

¶31 Under *Gunwall* this court has analyzed various factors to determine whether the state constitution bears differently upon an issue than its federal counterpart.[17] 106 Wn.2d at 61-62. Attorneys arguing cases with a United States Constitution analog are strongly encouraged to brief relevant factors. *City of Woodinville v. Northshore United Church of Christ*, 166 Wn.2d 633, 642, 211 P.3d 406 (2009). Here neither party has adequately briefed *Gunwall* factors. Moreover neither party makes any argument that the state constitution bars firearm regulation of 17-year-olds. Accordingly, we decline to decide whether the state constitution

---

[17] *Gunwall* recommends six "nonexclusive neutral criteria" for determining when and how the Washington Constitution provides different protection than the United States Constitution, including (1) the texts, (2) significant differences in parallel provisions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between the federal and state constitutions, and (6) matters of particular state interest. 106 Wn.2d at 61-62.

provides greater protection in this context. For the purposes of this case, it is enough that the state constitutional right to bear arms is clearly an individual one.

## III. The Parties Do Not Present Adequate Argument Why Washington's Statutory Restrictions on Child Gun Possession Violate the Right To Bear Arms

¶32 Having determined the Second Amendment protects individual rights against state interference, we turn to RCW 9.41.040(2)(a)(iii) to determine whether Washington's restrictions on children possessing firearms unconstitutionally infringe on a minor's right to bear arms.

¶33 Sieyes asks us to subject RCW 9.41.040(2)(a)(iii) to strict scrutiny, which would require determining whether the statute is narrowly tailored to achieve a compelling governmental interest.[18] Although the Supreme Court has held regulations infringing on fundamental rights to strict scrutiny, *Heller* explicitly "declin[es] to establish a level of scrutiny for evaluating Second Amendment restrictions," 554 U.S. at 634. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' would fail constitutional muster." *Id.* at 628-29 (footnote and citation omitted) (quoting *Parker v. District of Columbia*, 375 U.S. App. D.C. 140, 478 F.3d 370, 400 (2007). Moreover the Court specifically rejected a "rational basis scrutiny" as too low a standard to protect the right to bear

---

[18] Under the minimal level of review the "rational basis" test—a law will be upheld if it is rationally related to a legitimate government purpose. *See, e.g., N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 99 S. Ct. 1355, 59 L. Ed. 2d 587 (1979). Under middle level, or "intermediate scrutiny" analysis, a law is upheld if substantially related to an important government purpose. *See, e.g., United States v. Virginia*, 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996). A law will pass the most intensive level of scrutiny, "strict scrutiny," if necessary to achieve a compelling government purpose—proof the law is the least restrictive means of achieving the purpose. *See, e.g., Johnson v. California*, 543 U.S. 499, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005).

arms.[19] *Id.* at 628 n.27. The Court also rejected any "interest-balancing approach," reasoning by way of analogy, "The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different." *Id.* at 635. Instead *Heller* held, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35.

¶34 We follow *Heller* in declining to analyze RCW 9.41.040(2)(a)(iii) under any level of scrutiny.[20] Instead we look to the Second Amendment's original meaning, the traditional understanding of the right, and the burden imposed on children by upholding the statute. *See generally* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1449 (2009).

¶35 Tellingly Sieyes fails to provide convincing authority supporting an original meaning of the Second Amendment, which would grant all children an unfettered right to bear arms. In fact during oral argument Sieyes's counsel conceded the opposite. Furthermore Sieyes makes no adequate argument specific to the facts of this case that a 17-year-old's Second Amendment right to keep and bear arms has

---

[19] The Court also noted, "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Heller*, 554 U.S. at 628 n.27.

[20] Despite this court's occasional rhetoric about "reasonable regulation" of firearms, we have never settled on levels-of-scrutiny analysis for firearms regulations. *Montana*, 129 Wn.2d at 590 n.1 (plurality); *see id.* at 599 (Durham, C.J., concurring) (noting it is "unwise to speculate about the boundaries of the 'reasonable regulation' limit on the constitutional right to bear arms in self-defense"). Our decision not to employ levels-of-scrutiny analysis is consistent with our precedents.

been violated by this statute.[21] Similarly Sieyes mentions the statute restricting children from possessing firearms violates his right to bear arms under article I, section 24, but cites no authority and makes no argument for this proposition.[22] Sieyes's objection may be that he was 17 years old at the time of his arrest, and his right to bear arms should be equal to that of an 18-year-old's, but his arguments fail to challenge the statutory age limit set by this statute. In sum appellant offers no convincing authority supporting his argument that Washington's limit on childhood firearm possession violates the United States or Washington Constitutions. Accordingly we keep our powder dry on this issue for another day.[23]

## CONCLUSION

¶36 The Second Amendment right to bear arms applies to the states through the due process clause of the Fourteenth Amendment. We remain unconvinced, however, that RCW 9.41.040(2)(a)(iii) violates either the state or federal constitutional right to bear arms on the sparse record before us. We remand to the Court of Appeals for further proceedings on the remaining issues.

C. JOHNSON, ALEXANDER, CHAMBERS, and OWENS, JJ., concur.

MADSEN, C.J., concurs in the result only.

---

[21] Sieyes claims anecdotes in *Heller* should persuade us "the Second Amendment forbids absolute prohibitions on firearm possession by minors." Appellant's Suppl. Br. at 9 (Wash. Ct. App. No. 36799-8-II). This broadsided argument against absolute prohibitions on gun possession by minors misses the mark because RCW 9.41.040(2)(a)(iii) is not an absolute prohibition (note the nine exceptions in RCW 9.41.042).

[22] Appellant could have made this argument by analyzing the issue under *Gunwall*. For example he might have provided evidence of a historical tradition in Washington of 17-year-olds possessing or using firearms for defense of themselves or the state, or of background legal principles to that effect.

[23] The argument put forth by the dissent is no substitute for an argument briefed by opposing parties.

¶37 STEPHENS, J. (concurring) — I concur in the result reached by the majority. Christopher Sieyes offers no analysis of how RCW 9.41.040(2)(a)(iii) violates either article I, section 24 of the Washington State Constitution or the Second Amendment to the United States Constitution—under any level of scrutiny. Instead, his argument rests on the erroneous premise that that statute "is an absolute prohibition of firearm possession by minors." Appellant's Suppl. Br. at 3. The majority properly rejects this claim. Majority at 295-96 & n.21.

¶38 For me, the discussion ends there, and I would refrain from engaging in an extended exploration of the unsettled question of federal incorporation of the Second Amendment. Restraint is particularly appropriate here because the very question is currently pending before the United States Supreme Court. *McDonald v. City of Chicago*, No. 08-1521 (U.S., to be argued Mar. 2, 2010). I appreciate that state court decisions on questions of federal law may often serve valuable purposes in our system of dual sovereignty. *See generally* Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds*, 63 TEX. L. REV. 1025 (1985). However, I do not believe this is an instance where there is anything to be accomplished, particularly as our opinion is likely to be eclipsed before the ink it takes to print it is dry.

FAIRHURST, J., concurs with STEPHENS, J.

¶39 J.M. JOHNSON, J. (concurring and dissenting in part) — The majority correctly holds (i) that the due process clause of the Fourteenth Amendment to the United States Constitution incorporates the Second Amendment against the states and (ii) that article I, section 24 of our state constitution also protects an individual right to bear arms. However, the majority then applies too low a level of

scrutiny to RCW 9.41.040(2)(a)(iii),[24] which dramatically restricts the exercise of the constitutionally protected right to bear arms. In declining to apply strict scrutiny and instead "look[ing] to the Second Amendment's original meaning, the traditional understanding of the right, and the burden imposed on children by upholding the statute," the majority disregards our long-standing national tradition allowing younger citizens to bear arms and the level of protection that we customarily accord to fundamental rights. Majority at 295-96. I therefore write separately to emphasize that strict scrutiny is the appropriate standard of review for Second Amendment challenges to statutes restricting these important constitutional rights.

¶40 This conclusion is inescapable when one considers the fundamental nature of the right to keep and bear arms throughout our nation's history and our legacy of extending that right to young people. Youth have been permitted and even on occasion requested to bear arms since our country's nascent days and throughout the history of our state. The *Journals of the Continental Congress*, for example, identified "healthy, sound and able bodied men . . . not under *sixteen* years of age" as the preferred category of men from which the officers of the Continental army were to recruit their soldiers.[25] Even younger soldiers volunteered and managed to enlist. *See* LOUIS H. CORNISH, A NATIONAL REGISTER OF THE SOCIETY: SONS OF THE AMERICAN REVOLUTION 722 (A. Howard Clark ed., 1902) ("John Green . . . became a Revolutionary soldier at the age of *fifteen* and was with Washington at Valley Forge . . . ." (emphasis added)).

¶41 What were these teenagers fighting for? I remind the court that, among other things, they fought for the right

---

[24] See majority at 279 note 1 for the full text of this convoluted statute.

[25] IV JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789, at 63 (Worthington Chauncey Ford ed., 1906) (1776) (emphasis added). On the other side of hostilities, General Thomas Gage pressed 12- and 13-year-old lads into service. DAVID M. ROSEN, ARMIES OF THE YOUNG: CHILD SOLDIERS IN WAR AND TERRORISM 4-5 (2005) (citing A. W. COCKERILL, SONS OF THE BRAVE: STORY OF BOY SOLDIERS 60 (1984); THE REVOLUTION REMEMBERED: EYEWITNESS ACCOUNTS OF THE WAR FOR INDEPENDENCE (John C. Dann ed., 1980)).

to bear arms, *see* U.S. CONST. amend. II, a right that unquestionably extended in its fullest form to those adolescents who took up arms to defend it. As the majority points out, gun rights are "an inexorable birthright of American tradition . . . 'held . . . to be fundamental' " by those who participated in the Revolutionary War. Majority at 284 (quoting STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED: THE EVOLUTION OF A CONSTITUTIONAL RIGHT 55 (1984)); *see also id.* at 284-85 (discussing the "fundamental" and "deeply rooted" national and individual state traditions of recognizing the right to bear arms); *District of Columbia v. Heller*, 554 U.S. 570, 593, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) ("By the time of the founding, the right to have arms had become fundamental for English subjects.").

¶42 Young people continued to bear arms for this country through the Civil War, a conflict in which close to half a million boys aged 16 years old and younger—many of whom lied about their age in order to enlist—served with distinction.[26] One boy soldier, Willie Johnston, earned the Congressional Medal of Honor for heroism demonstrated when he was only 11 years old.[27] Johnston was not alone in his precocious valor: roughly 65 other juvenile soldiers earned the Medal of Honor during the Civil War.[28] These and the other brave boys and young men who served in the Civil War, like their compatriots almost a century earlier, undeniably enjoyed full entitlement to all of the fundamental rights for which they fought and died, including the right to keep and bear arms. State laws that infringe or impair such

---

[26] JIM MURPHY, THE BOYS' WAR: CONFEDERATE AND UNION SOLDIERS TALK ABOUT THE CIVIL WAR 2 (1990).

[27] RON OWENS, MEDAL OF HONOR: HISTORICAL FACTS AND FIGURES 32 (2004).

[28] *Id.* at 31-32. The ages of these soldiers were as follows: 32 awardees were 17 years old; 20 were 16 years old; 6 were 15 years old; 5 were 14 years old; and 2 were 13 years old. *Id.* at 32. Historical records such as these lend credence to the statement that the Civil War "could almost have been called the teenager's war." *Id.* at 31.

a right thus merit strict scrutiny[29] or, at a minimum, intermediate scrutiny.

¶43 There is remarkable irony in concluding that gun rights were somehow *less* fundamental to the adolescent soldiers who fought to protect them or that we should scrutinize limitations of those rights less exactingly on account of age. If age did not bar teenagers from serving in the Continental or Union armies, how could it bar them from receiving full judicial protection for the rights they championed? The simple answer is that it did not do so then, and it does not do so now. If a soldier is old enough to fight for the nation, he is old enough to enjoy the fundamental right to keep and bear arms. Accordingly, strict scrutiny must apply to statutes limiting this right.

¶44 The tradition of underage service in our military has moderated from the great wars of centuries past, but it nevertheless endures. As early as their 17th birthdays, American youths are allowed to take up arms and enlist in the army, navy, air force, Marine Corps, or Coast Guard with the permission of their parents. 10 U.S.C. § 505(a). Such 17-year-old volunteers do not yet enjoy the right to vote, U.S. CONST. amend. XXVI; the right to possess, consume, or acquire alcohol, *see, e.g.*, RCW 66.44.270(2)(a); or the ability to serve as elected officials in any branch of the federal government, U.S. CONST. art. I, § 2, cl. 2; art. I, § 3, cl. 3; art. II, § 1, cl. 5; but they unambiguously *do* have the right to bear arms. Indeed, state law protects this right, at least to the extent that it is exercised by youths on active military duty. RCW 9.41.042(9) (exempting from RCW 9.91-.040(2)(a)(iii) "any person under the age of eighteen years who is . . . a member of the armed forces of the United States, national guard, or organized reserves, when on duty"). To pretend otherwise—or to conclude that the right to bear arms is somehow less fundamental to those men and women in uniform who have yet to see their 18th

---

[29] The Second Amendment reads, "shall not be infringed." U.S. CONST. amend. II. The Washington Constitution reads, "shall not be impaired." WASH. CONST. art. I, § 24.

birthday—is to turn a blind eye to a centuries-old American military practice.

¶45 In each of these examples, both past and present, Americans under the age of 18 are not only allowed but encouraged to bear arms in defense of their country, like their older compatriots. Granted, it is constitutionally permissible with exceptional justification to limit the Second Amendment rights of adult civilians, *see, e.g.*, *Heller*, 554 U.S. at 626 (acknowledging the validity of "longstanding prohibitions on the possession of firearms by felons and the mentally ill [and] in sensitive places such as schools and government buildings"), and thus it is certainly also constitutional to restrict the right of teenagers to bear arms in limited, prescribed circumstances outside of the military, *see, e.g.*, *United States v. Rene E.*, 583 F.3d 8, 13-15 (1st Cir. 2009) (citing cases evidencing "a view, from at least the Civil War period, that regulating juvenile access to handguns . . . did not offend constitutional guarantees of the right to keep and bear arms"), *cert. denied*, 130 S. Ct. 1109 (U.S. Jan. 11, 2010) (No. 09-7852).

¶46 It is the analysis that courts apply to scrutinize legislative limitations of the rights of our young people relative to adults, however, that forms the crux of my disagreement with the majority. The majority declines to hold that strict scrutiny applies to broad statutory restrictions such as RCW 9.41.040(2)(a)(iii) (and even rejects the lesser intermediate scrutiny under which compelling interests such as school safety may be shown greater deference). Majority at 294-95. I am convinced that only applying strict scrutiny, or in some cases the latter, lesser standard, appropriately protects the fundamental constitutional right infringed or impaired by the state's regulation.

¶47 The majority correctly points out that the United States Supreme Court recently declined to identify the level of scrutiny generally applicable to infringements of rights under the Second Amendment. Majority at 294-95 (quot-ing *Heller*, 554 U.S. at 634). However, the indecision of the United States Supreme Court does not necessar-

ily bind *this* Supreme Court to the unclear contextual standard of review that emerged from that Second Amendment case. Although it is true that a number of the lower federal courts that have heard Second Amendment challenges since *Heller* have followed the United States Supreme Court and chosen not to apply one of the traditional levels of scrutiny to such infringements,[30] many courts have done the opposite, applying strict scrutiny or intermediate scrutiny depending on the importance of the Second Amendment interest involved.[31] These courts have never applied rational basis review. *See Heller*, 554 U.S. at 628 n.27 (effectively foreclosing the application of rational basis review to Second Amendment challenges). It is incumbent on this court to select a clear standard for evaluating legislative limitations of the right to keep and bear arms,

---

[30] The "traditionally expressed levels" of scrutiny include "strict scrutiny, intermediate scrutiny, and rational basis." *Heller*, 554 U.S. at 634; *see United States v. Marzzarella*, 595 F. Supp. 2d 596, 604-06 (W.D. Pa. 2009) (applying "the standard applicable to content-neutral time, place and manner restrictions [of speech]" to uphold 18 U.S.C. § 922(k), which forbids the removal of a firearm's serial number); *United States v. Luedtke*, 589 F. Supp. 2d 1018, 1024 (E.D. Wis. 2009) (using *Heller*'s "historical analysis of the types of restrictions permitted by the Second Amendment" to sustain 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by persons subject to domestic violence protective orders); *United States v. Booker*, 570 F. Supp. 2d 161, 162-63 (D. Me. 2008) (using the same analysis to uphold 18 U.S.C. § 922(g)(9), which permanently disarms domestic violence misdemeanants).

[31] *See United States v. Skoien*, 587 F.3d 803, 805 (7th Cir. 2009) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(9)); *United States v. Bay*, No. 2:09--CR-83 TS, 2009 WL 3818382, at *2, *4 (D. Utah Nov. 13, 2009) (mem.) (applying strict scrutiny and upholding 18 U.S.C. § 922(g)(1), which permanently disarms felons). As is obvious from these examples, *see also supra* note 30, the lower federal courts are by no means in agreement over which standards of scrutiny apply to various categories of Second Amendment claims. At times, they have directly contradicted each other not only in their choice of a standard but also in their reading of *Heller* itself. *Compare United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231 (D. Utah 2009) (applying strict scrutiny to an 18 U.S.C. § 922(g)(9) challenge because "the *Heller* Court described the right to keep and bear arms as a fundamental right [and] categorized [it] with other fundamental rights which are analyzed under strict scrutiny"), *with United States v. Miller*, 604 F. Supp. 2d 1162, 1170-71 (W.D. Tenn. 2009) (applying intermediate scrutiny to an 18 U.S.C. § 922(g) challenge because the *Heller* court "never explicitly embraced . . . the right to bear arms as 'fundamental' under the Constitution"), *and Marzzarella*, 595 F. Supp. 2d at 604-05 (arguing that *Heller* does not require strict scrutiny). To avoid similar confusion in our lower state courts, we should identify a single standard here.

whether it is protected under the Second Amendment or article I, section 24 of the Washington Constitution.

¶48 The United States Supreme Court has observed that rational basis review would render the Second Amendment "redundant with the separate constitutional prohibitions on irrational laws, and [without] effect." *Heller*, 554 U.S. at 628 n.27. Under our jurisprudence, and to provide clear guidelines for our lower courts, this court thus must choose either the exacting strict scrutiny, under which a statute must be " 'necessary to serve a compelling state interest' " and " 'narrowly drawn to achieve that end,' " *Rickert v. Pub. Disclosure Comm'n*, 161 Wn.2d 843, 848, 168 P.3d 826 (2007) (internal quotation marks omitted) (quoting *Burson v. Freeman*, 504 U.S. 191, 198, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992)), or the lesser intermediate scrutiny, under which a statute limiting the exercise of a right must be "substantially related to an important government interest," *State v. Williams*, 144 Wn.2d 197, 211, 26 P.3d 890 (2001).

¶49 This court has applied the standard of strict scrutiny to statutes that impact rights deemed fundamental.[32] Here, we have such a right: the fundamental right to bear arms. We apply strict scrutiny in other cases even when the fundamental rights in question belong to minors. *See, e.g.*, *City of Sumner v. Walsh*, 148 Wn.2d 490, 505, 504, 61 P.3d 1111 (2003) (Chambers, J., concurring) ("The mere fact that

---

[32] *See, e.g.*, *State v. Warren*, 165 Wn.2d 17, 34, 195 P.3d 940 (2008) (strict scrutiny applies to the rights to marry and parent); *First Methodist Church v. Hearing Exam'r*, 129 Wn.2d 238, 249, 916 P.2d 374 (1996) (same with respect to free exercise of religion); *In re Juveniles A, B, C, D, E*, 121 Wn.2d 80, 97-98, 847 P.2d 455 (1993) (same with respect to the right to privacy); *cf. Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 220, 143 P.3d 571 (2006) (strict scrutiny of statute depriving taxi cab driver of his license for failure to pay child support *not* required because "neither this court nor the United States Supreme Court has characterized the right to pursue a particular profession as a fundamental right"). *But see In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980) (no application of strict scrutiny to statute limiting the " 'sacred right' " to parent (quoting *Moore v. Burdman*, 84 Wn.2d 408, 411, 526 P.2d 893 (1974))).

only children are involved does not undermine th[e] threshold determination [that] [s]trict scrutiny applies.").[33]

¶50 There is good reason to apply strict scrutiny to the fundamental right at issue here, a right expressly protected in both the United States and Washington constitutions without suggestion of an age limitation. After all, as the United States Supreme Court observed in another, equally controversial juvenile rights context, "Constitutional rights "do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional ·rights." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74, 96 S. Ct. 2831, 49 L. Ed. 2d 788 (1976). Although the State may limit the constitutional rights of adolescents in circumstances different from those applied to adults in some contexts,[34] that does not mean that we scrutinize such limitations less rigorously. We merely attach more weight to the State's compelling interests in limiting the right in question where youths are involved. That is, "[t]he *Bellotti* test does not establish a lower level of scrutiny for the constitutional rights of minors," but rather "enables courts to determine whether the state has a compelling interest justifying greater restrictions on minors than on adults." *Nunez v. City of San*

---

[33] In *Walsh*, the majority struck down as unconstitutionally vague a municipal curfew ordinance that made it unlawful for the parent of a juvenile to permit that juvenile to "*remain* in any public place" during certain hours. *Walsh*, 148 Wn.2d at 492-93, 502. Although it declined to evaluate the ordinance as an infringement of a fundamental right, the majority noted that "an ordinance might experience a more difficult time passing constitutional muster on the grounds Justice Chambers discusses in his concurring opinion, i.e., that [it] violates the constitutional right of a juvenile to move freely in public places," *id.* at 502 n.8, a comment that suggests support for Justice Chambers' application of strict scrutiny. *Accord In re Interest of M.G.*, 103 Wn. App. 111, 118, 11 P.3d 335 (2000); *cf. State v. Schaaf*, 109 Wn.2d 1, 21, 743 P.2d 240 (1987) (strict scrutiny did *not* apply to the juvenile jury trial right because a jury trial "is not constitutionally guaranteed [in juvenile court], and thus is *not* a fundamental right, from a juvenile's standpoint" (emphasis added)).

[34] *See In re M.G.*, 103 Wn. App. at 118-19 (separate analysis of juvenile constitutional rights justified by (1) the particular vulnerability of children; (2) their inability to make decisions in an informed, mature manner; and (3) the importance of the parental role in child rearing (citing *Bellotti v. Baird*, 443 U.S. 622, 634, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979))).

*Diego*, 114 F.3d 935, 945 (9th Cir. 1997) (citing *Bellotti v. Baird*, 443 U.S. 622, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979)). Thus, a petitioner's status as a juvenile affects the "compelling interest" prong of our strict scrutiny analysis, not the relevance of strict scrutiny itself to his or her claim.

¶51 We have recognized that juvenile constitutional rights are as deserving of heightened scrutiny as adult rights in other contexts. *See, e.g., York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 303, 178 P.3d 995 (2008) ("Students 'do not shed their constitutional rights at the schoolhouse door.' " (internal quotation marks omitted) (quoting *Goss v. Lopez*, 419 U.S. 565, 574, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975))). In *York*, we held that the fundamental privacy rights of underage student athletes, as secured by article I, section 7 of our state constitution, were violated by random, suspicionless drug testing. *See* 163 Wn.2d at 316. Although *York* did not apply strict scrutiny per se because it evaluated the testing program as a privacy violation not justified by "authority of law" as required by article I, section 7, *id.* at 306-07, it *did* hold the program to a very high standard of scrutiny, *id.* at 306 (requiring the drug testing program to satisfy one of the "jealously guarded exceptions" to the warrant requirement). The drug testing program failed to meet this standard, even considering the students' diminished expectation of privacy as interscholastic athletes competing on school grounds. *Id.* at 307-10.

¶52 Guns may be dangerous in the hands of minors, but so were the drugs that the testing program in *York* sought to discover. We should not examine with any less intensity impairment of infringement of the gun rights of youth under the Second Amendment than we do limitations of their right to be free from unwarranted searches under the Fourth Amendment or our more demanding state iteration, article I, section 7. Thus, we should subject RCW 9.41-.040(2)(a)(iii) to strict scrutiny.

¶53 That we fail to do so here is an illustration of the diluted standard sometimes applied to the constitutional

right to keep and bear arms protected by the Second Amendment to the United States Constitution and article I, section 24 of our state constitution. This right has seldom been viewed as deserving the same protection as other fundamental rights found in either the Bill of Rights or our state constitution. No good reason exists to continue this legacy of disregard and disproportionate review. In fact, doing so furthers the risk that courts—or the legislature— will do injustice to other fundamental constitutional rights of our young people by failing to adequately scrutinize laws that limit those rights. Because I believe such an outcome to be contrary to our national and state constitutional heritage of respecting gun rights and applying strict scrutiny to restrictions imposed on the fundamental rights of even our younger citizens, I cannot join the majority. The fundamental constitutional right to bear arms deserves the highest level of scrutiny—strict scrutiny—a standard of review that this statute cannot survive. I therefore dissent.