FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MAY 8, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MAY 8, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 102940-3 |
| Appellant, | ) | |
| v. | ) | En Banc |
| GATOR'S CUSTOM GUNS, INC., a Washington for-profit corporation, and WALTER WENTZ, an individual, | ) | Filed: May 8, 2025 |
| Respondents. | ) | |

JOHNSON, J.—This case involves a constitutional challenge to Engrossed Substitute Senate Bill 5078 (ESSB 5078),[1] which prohibits the manufacture, distribution, importation, and sale of firearm magazines with the capability of holding more than 10 rounds of ammunition. Gator's Custom Guns Inc. alleges ESSB 5078 violates the right to bear arms protected by article I, section 24 of the

---

[1] 67th Leg., Reg. Sess. (Wash. 2022).

Washington Constitution and the Second Amendment to the United States Constitution. In addition to defending the constitutionality of ESSB 5078, the State has requested reassignment to another superior court in the event that we find in its favor. We hold that ESSB 5078 does not violate either the Washington or United States constitutional protection of the right to bear arms because large capacity magazines (LCMs) are not "arms" within the meaning of either constitutional provision, nor is the right to purchase LCMs an ancillary right necessary to the realization of the core right to possess a firearm in self-defense. However, we deny the State's request for reassignment.

## FACTS AND PROCEDURAL HISTORY

In 2022, the Washington State Legislature enacted ESSB 5078, codified at RCW 9.41.010, .370 , and .375. ESSB 5078 prohibits the "manufacture, import, distribution, or [sale]" of any "large capacity magazine" in Washington. RCW 9.41.370(1). LCMs are defined as "ammunition feeding device[s] with the capacity [capable] to accept more than 10 rounds of ammunition." RCW 9.41.010(25). ESSB 5078 also creates a claim under the Washington Consumer Protection Act (CPA), ch. 19.86 RCW, for violations of the LCM ban. RCW 9.41.375. When enacting ESSB 5078, the Washington State Legislature found:

> Firearms equipped with large capacity magazines increase casualties by allowing a shooter to keep firing for longer periods of time without reloading. Large capacity magazines have been used in all 10 of the deadliest mass shootings since 2009, and [in] mass shooting events

2

> from 2009 to 2018 . . . the use of large capacity magazines caused twice as many deaths and 14 times as many injuries. Documentary evidence following gun rampages, including the 2014 shooting at Seattle Pacific University, reveals many instances where victims were able to escape or disarm the shooter during a pause to reload, and such opportunities are necessarily reduced when large capacity magazines are used. . . . Based on this evidence, . . . the legislature finds that restricting the sale, manufacture, and distribution of large capacity magazines is likely to reduce gun deaths and injuries.

LAWS OF 2022, ch. 104, § 1.

Gator's, a Kelso-based gun store, allegedly continued to sell prohibited LCMs after ESSB 5078 went into effect. In July 2023, the Washington attorney general issued a civil investigative demand, and in August, Gator's filed a petition to set aside the demand as invalid and unenforceable, alleging that ESSB 5078 violates the right to bear arms as protected by article I, section 24 of the Washington Constitution.[2] In September, the State separately filed a CPA enforcement action against Gator's and its owner, Walter Wentz, and Gator's answer raised the unconstitutionality of ESSB 5078 under both constitutions as an affirmative defense. The Cowlitz County Superior Court ordered the two cases consolidated.

---

[2] The State alleges that Gator's made the intentional choice not to plead a Second Amendment challenge in its petition to set aside the civil investigative demand to avoid removal to federal court. Regardless, the Second Amendment issue was pleaded as an affirmative defense in Gator's answer to the State's CPA action, which was consolidated with Gator's petition, and thus the superior court's order addresses the Second Amendment claim.

The parties cross motioned for summary judgment. The superior court granted summary judgment in favor of Gator's, finding ESSB 5078 unconstitutional under both article I, section 24 and the Second Amendment and enjoined its enforcement. The State sought review directly in this court, and Commissioner Michael Johnston issued an emergency order staying the superior court's ruling pending our review. This court granted direct review and maintained the stay.[3]

## ANALYSIS

### I.      LCMs Are Not Protected "Arms"

Review of the constitutionality of a statute is de novo. *Bennett v. United States*, 2 Wn.3d 430, 441, 539 P.3d 361 (2023). Article I, section 24 of the Washington Constitution provides that "[t]he right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men." The Second Amendment to the United States Constitution provides that "[a] well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear

---

[3] We have accepted amici briefs from the National Rifle Association of America, the Firearms Policy Coalition, the Gunowners of America Inc. et al., the National Shooting Sports Foundation Inc., the Goldwater Institute, the Alliance for Gun Responsibility and Brady Center to Prevent Gun Violence, the NAACP Alaska/Oregon/Washington State Area Conference, and the Second Amendment Foundation.

arms, shall not be infringed." The United States Supreme Court has held that this provision protects the right to keep and bear arms as a means of self-defense. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) (hereinafter *Bruen*). That right is fully applicable to the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 771-76, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (partial plurality opinion).

Although we "interpret the state right separately and independently of its federal counterpart," *State v. Jorgenson*, 179 Wn.2d 145, 155, 312 P.3d 960 (2013), we have interpreted the meaning of the word "arms" using Second Amendment precedent. *See City of Seattle v. Evans*, 184 Wn.2d 856, 869, 366 P.3d 906 (2015) ("[T]his approach [to the parameters of the right to bear arms] . . . is rooted in the United States Supreme Court's decision in *Heller*."[4]). Thus, our interpretation of the scope of the two protections—that is, the meaning of "arms" under article I, section 24 and the Second Amendment, is not inconsistent. In other words, an "arm" under article I, section 24 must be an "arm" under the Second Amendment and vice versa. Accordingly, we begin by ascertaining whether ESSB 5078 regulates "arms" within the meaning of these provisions, guided by both the

---

[4] *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

United States Supreme Court precedent that gives meaning to the plain text of the Second Amendment and our own cases that apply those precedents.

The State argues ESSB 5078 falls outside both protections of the right to bear arms because LCMs are neither "arms" nor commonly used for self-defense. The State argues that the plain text of the two provisions applies only to "arms," and that LCMs cannot be construed as "arms" because they are not weapons but merely a subclass of containers for ammunition cartridges that are added to weapons to make them "more capable of mass murder." Appellant's Br. at 24. The State's expert witness, Professor Dennis Baron, testified that English speakers during the Founding and Reconstruction eras would have understood the term "arms" to refer to weapons, not ammunition or cartridge boxes (the historical analog to magazines). 4 Clerk's Papers (CP) at 1405-06. Further, the State argues that LCMs are not "traditionally or commonly used for self-defense" because they are "military-style weapons" equipped to serve "combat functions, not self-defense functions." Appellant's Br. at 28-29 (boldface omitted).[5] The State argues that

---

[5] Citing *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 101 (D. Conn. 2023) ("LCMs were originally designed for military use in World War I and did not become widely available for civilian use until the 1980s."); *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (LCMs "'are particularly designed and most suitable for military and law enforcement applications.'" (quoting court papers)), *abrogated on other grounds by Bruen*, 597 U.S. 1; BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, U.S. DEP'T OF JUST., STUDY ON THE IMPORTABILITY OF CERTAIN SHOTGUNS 5 (Jan. 2011) ("[L]arge capacity magazines are a military feature."), https://www.atf.gov/resource-center/docs/january-2011-importability-certain-shotgunspdf/download [https://perma.cc/C756-3L69].

LCMs have "virtually no utility for self-defense" because "individuals almost never fire more than ten rounds in self-defense," and instead the average number of shots fired in self-defense is merely 2.2. Appellant's Br. at 30, 31; 5 CP at 1510 (expert report of Lucy P. Allen).

The superior court held that LCMs are "arms" because LCMs are magazines. It reasoned that the purpose of a magazine is to facilitate the function of a semiautomatic weapon, and thus magazines are a "critical functional component" of a firearm or, in Gator's words, an "integral component" of a firearm. 6 CP at 2109-63; Resp'ts' Br. at 10. Accordingly, the superior court "infer[red] from the record . . . that magazines are commonly and lawfully possessed by law abiding citizens for lawful purposes." 6 CP at 2121. Further, Gator's argues that because there are between "30 million to 159.8 million" LCMs in circulation, "[t]hey are common and therefore protected." Resp'ts' Br. at 51 (citing CP at 1029), 52. To assert that these LCMs are used for self-defense, Gator's relies on William English's *2021 National Firearms Survey: Analysis of Magazine Ownership and Use*, asserting that 48 percent of gun owners have owned LCMs, and 71 percent of those individuals reported that they owned them for "defensive purposes." William English, *2021 National Firearms Survey: Analysis of Magazine Ownership and Use* 4 (Georgetown McDonough Sch. of Bus.,

Research Paper No. 4444288, 2023), https://ssrn.com/abstract=4444288.[6] Gator's also argues that the State's assertion that LCMs are designed for military use is actually evidence *in favor* of a weapon's classification as a protected "arm" because certain knives have been found to be "arms" due to their military origins and purpose. Resp'ts' Br. at 39 (citing *Evans*, 184 Wn.2d at 867-68, 870).

In *Heller*, the United States Supreme Court held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and the Court interpreted "arms" to include "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" 554 U.S. at 582, 581 (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)). In *Evans*, this court evaluated whether a small, fixed-blade "paring" knife, carried for self-defense, was covered by the Washington Constitution by surveying the scope of "arms" under the Second Amendment, and in particular in light of the United States Supreme Court's interpretation of the term in *Heller*. 184 Wn.2d 856. We held that

> the right to bear arms protects *instruments that are designed as weapons traditionally or commonly used by law abiding citizens for*

---

[6] *But see* Deborah Azrael et al., *A Critique of Findings on Gun Ownership, Use, and Imagined Use from the 2021 National Firearms Survey: Response to William English*, 78 SMU L. REV. (forthcoming 2025), https://ssrn.com/abstract=4894282 (discussing various methodological concerns with the English study, including inaccuracies associated with the format of the study and the survey's small sample size, ambiguous questions, significant disparity with other reputable surveys, and failure to disclose the survey's source of funding).

> *the lawful purpose of self-defense*. In considering whether a weapon is an arm, we look to the *historical origins and use* of that weapon, noting that a weapon does not need to be designed for military use to be traditionally or commonly used for self-defense. We will also consider the weapon's *purpose and intended function*.

*Evans*, 184 Wn.2d at 869 (emphasis added). We determined that although some fixed-blade knives could be considered "arms," the origins, use, purpose, and function of paring knives were culinary, in contrast to other knives that were "designed for and historically used in battle." *Evans*, 184 Wn.2d at 872. We concluded that although paring knives *could* be used as a weapon for self-defense, not all instruments that "may plausibly be used for self-defense" are protected, and the paring knife was not an "arm" under section 24. *Evans*, 184 Wn.2d at 873.

We conclude that LCMs are not protected by article I, section 24 because (1) LCMs are not instruments designed as weapons, (2) LCMs are not traditionally or commonly used for self-defense, and (3) the right to purchase LCMs is not among the ancillary rights necessary to the realization of the core right to bear arms in self-defense.

In order to determine whether LCMs are "instruments that are designed as weapons traditionally or commonly used by law abiding citizens for the lawful purpose of self-defense," it is first logically necessary to determine whether they are even instruments designed as *weapons*. *Evans*, 184 Wn.2d at 869. First, LCMs are not weapons—they are attachments to weapons, or accessories. Or, in the

words of *Heller*'s historical definition of "arms," LCMs are not used "to cast at . . . another" because they are merely attached to a firearm in order to modify the firearm's capacity "to cast at . . . another" without reloading—the LCM itself does not cast the round but feeds the round into the firearm. Further, it is not factually accurate to say that LCMs are "integral components" of firearms. Although the parties agree that certain types of firearms require the addition of a detachable magazine to function, ESSB 5078 does not regulate detachable magazines. ESSB 5078 regulates only LCMs—magazines that are capable of accepting more than 10 rounds of ammunition—and Gator's admits that no firearm requires a magazine of this particular capacity to function. Thus, LCMs are not required for a firearm to function. The superior court's conclusion that LCMs are required for the firearm to work and therefore they are "designed as weapons" is incorrect.

Further, the trial court's logic that magazines are arms, and thus large capacity magazines are necessarily also arms is problematic. First, we have never held that magazines are arms, and the fact that a semiautomatic weapon will not function as intended without one does not conclusively establish that they are. More importantly, the constitutional protection of some instruments in a category does not require the protection of all instruments belonging to the same category. We expressly rejected that logic in *Evans*, when we held that the constitutional protection of some knives did not require the protection of knives that did not have

a self-defense purpose. *See Evans*, 184 Wn.2d at 871-72. That precedent establishes that the proper inquiry is whether the *instrument that is being regulated* is protected by the state constitution, not whether the instrument belongs to a *class* that could not be banned as a whole. And the argument that magazines are protected because they are an "integral component" of a certain type of firearm (i.e., semiautomatics) is further troubling because, logically, the fact that the government could not ban an entire class of firearm component without impairing the right to bear arms does not mean that the government is not permitted to restrict a specific subclass of that component. If we were to adopt Gator's analysis on this point, the constitutional right would protect not only firearms, but it would protect all subtypes of components for all types of firearms.

In sum, we hold that LCMs are not "arms" in the constitutional sense because they are designed to be attached to a weapon in order to modify it by increasing that firearm's ammunition capacity, and they are not designed for use as a weapon themselves.[7]

Accordingly, we hold that LCMs do not fit the constitutional definition of "arms" before even reaching whether they are "commonly used for self-defense."

---

[7] It is also worth noting that federal firearm regulation does not treat magazines as firearms, as magazines do not fall within the definition codified in the Gun Control Act of 1968, 18 U.S.C. § 921(a)(3) (defining a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device"). For example, because magazines also do not fit the

However, LCMs also fall outside either protection of the right to bear arms because the provisions protect only those arms that are commonly used for self-defense, and we have been presented with no credible and persuasive evidence or argument that LCMs are commonly used for such a purpose. Although Gator's offers ownership statistics, whether LCMs are common in circulation does not inform this court whether they are "commonly used for self-defense," as how many LCMs are owned has no bearing on what those LCMs are actually used *for*. To that point, there is only minimal and highly contested evidence, which we do not find sufficient to bear Gator's burden to prove LCMs fall within constitutional protection.

Further, although in *Evans* the military origins or use of certain knives was useful for determining whether those knives were arms and protected, that evidence was informative because it was not clear whether the purpose of the knives was for combat or utility. 184 Wn.2d at 871-72. Here, it is clear that LCMs are attached to firearms in order to increase their ammunition capacity above 10 rounds, and there is undoubtedly a combat purpose behind the use of firearms. But our holding that "a weapon *does not need to be* designed for military use to be traditionally or commonly used for self-defense" does not establish whether such a

---

statute's definition of "ammunition," persons not permitted to possess firearms or ammunition under 18 U.S.C. § 922(g) may still possess magazines.

12

purpose is generally evidence *for or against* the weapon's qualification under the *Evans* test. 184 Wn.2d at 869. Rather, it is better understood as a negation of the argument that a weapon can be protected *only* if it is designed for military use—a point that was relevant in the context of analyzing whether a paring knife was disqualified from protection given that it was unlike knives that had a clearer combat purpose, but is not relevant when analyzing an instrument that is indisputably intended for combat. No showing has been made that the origins, use, purpose, or intended function of LCMs support the conclusion that they are commonly used for self-defense, and thus we hold that they are not within the scope of the rights to bear arms under the Washington and United States Constitutions.

The United States Supreme Court has interpreted the "central component" of the Second Amendment to be the "inherent right of self-defense." *Heller*, 554 U.S. at 599 (emphasis omitted), 628. Accordingly, federal courts of appeals have found the Second Amendment also "protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (recognizing right to purchase arms, but no corresponding right to sell them); *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (recognizing right to purchase ammunition), *cert. denied*, 576 U.S. 1013 (2015), *abrogation on other grounds*

*recognized by Baird v. Bonta*, 81 F.4th 1035, 1043 (9th Cir. 2023); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (recognizing right to access gun ranges in order to acquire and maintain proficiency in firearm use). These rights implicate the Second Amendment because the constitutional protection is broader than simply protecting "arms"—it protects individual conduct that falls within the scope of the right to bear arms in self-defense, and that implies protection of corresponding rights that are necessary to give the right to possess a firearm for self-defense meaning. *See Bruen*, 597 U.S. at 17 ("[W]hen the Second Amendment's plain text covers an *individual's conduct*, the Constitution presumptively protects that conduct." (emphasis added)). For example, in *Jackson*, the Ninth Circuit Court of Appeals found a prohibition on the sale of hollow-point ammunition regulated conduct within the scope of the Second Amendment, reasoning that although the Second Amendment does not explicitly protect ammunition, "without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." 746 F.3d at 967.

The right to purchase LCMs does not belong among the "ancillary rights" recognized in *Teixeira*, *Jackson*, and *Ezell*. Unlike the right to purchase arms, the right to acquire ammunition, or the right to access gun ranges, the ability to purchase LCMs is not necessary to the core right to possess a firearm in self-

defense. Here, without the right to purchase LCMs, an individual may still own, possess, operate, repair, and maintain proficiency with firearms, as LCMs are not an "integral component" of firearms. As noted above, some firearms may require a magazine to function as intended, but there are no firearms that require an LCM to function. This is unlike ammunition, which is an integral component of a firearm because ammunition is necessary for a firearm to function as intended: a lack of ammunition would render the firearm a paperweight—or, at best, a scarcely effective bludgeoning tool—and it no longer serves its function for the core purpose of self-defense. In contrast, without an LCM, a semiautomatic firearm is still capable of firing (up to 10 rounds, if it is equipped with a magazine falling outside ESSB 5078's restriction, or 1 round at a time, if it is equipped with none at all) until the operator must simply reload to continue operating the firearm as desired. This fulfills the firearm's purpose as a tool for realizing the core right of self-defense. This regulation does not limit the number of bullets or magazines that may be purchased or possessed. By restricting only magazines of a capacity greater than 10, the statute effectively regulates the maximum capacity of magazines, leaving the weapon fully functional for its intended purpose. Thus, we are not convinced that the restriction here renders the right to bear arms in self-defense meaningless. Indeed, we can safely say that individuals are still able to

exercise the core right to bear arms when they are limited to purchasing magazines with a capacity of 10 or fewer.

Because LCMs are not "arms" in the constitutional sense, and the right to purchase LCMs is not among the ancillary rights protected by the Second Amendment, neither article I, section 24 nor the Second Amendment offer any protection to against ESSB 5078's restriction on LCMs. Thus, the superior court's holding that ESSB 5078 is unconstitutional under those provisions was incorrect. Accordingly, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

## II. Reassignment

For the aforementioned reasons, we find that ESSB 5078 complies with the constitutional safeguards of the Second Amendment as well as article I, section 24 of the Washington Constitution. Accordingly, we reverse the superior court's order granting Gator's motion for summary judgement and denying that of the State, and remand for further proceedings consistent with our holding. The result of this outcome is that the superior court is left to consider the State's consumer-protection enforcement action against Gator's for violation of the LCM ban. In such a circumstance, the State has requested reassignment on remand.

Parties generally seek reassignment to another judge through a motion for recusal in the trial court, but a party may also seek reassignment for the first time

on appeal where, "for example, the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been exposed to prohibited information, expressed an opinion as to the merits, or otherwise prejudged the issue." *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014) (footnotes omitted). Additionally, "where review of facts in the record shows the judge's impartiality might reasonably be questioned, the appellate court should remand the matter to another judge." *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017).

In *McEnroe*, we declined to reassign a case on the basis that the trial judge allegedly "'ignored binding precedent'" because "legal errors alone do not warrant reassignment" and our decision limited the trial court's discretion as to the issue that was appealed. 181 Wn.2d at 388-89 (quoting court papers) ("Even if [the trial judge] holds 'strongly held views' about the contents of charging documents, he is bound on remand by this court's decision."). In *Solis-Diaz*, we granted reassignment where the same judge that originally sentenced the defendant was assigned to resentence the defendant after an appeal, the judge imposed the same sentence at resentencing, and then a subsequent appeal required the same judge to resentence that same defendant a third time, because we found the record reflected the sentencing judge's "frustration and unhappiness at the Court of Appeals requiring him to address anew [the defendant's sentence]." 187 Wn.2d at 541, 538

("[The trial judge] opined that the sentence he had previously imposed was 'precisely what the Legislature intended' in the circumstances of this case." (quoting court papers)).

Here, Judge Bashor's legal errors in determining that ESSB 5078 was unconstitutional are insufficient to warrant reassignment because our order that the statute is constitutional removes Judge Bashor's discretion as to the validity of ESSB 5078 for the remainder of the case, which will then relate only to consumer-protection enforcement. Although Judge Bashor will have discretion as to the remedies and penalties for Gator's alleged violation of ESSB 5078, the "issue that triggered the appeal" was limited to the validity of the statute Gator's is alleged to have violated. Given an order that the statute is constitutional and therefore valid, Judge Bashor will be bound to our decision on that issue. Although the record reflects Judge Bashor's strong feelings as to the constitutionality of ESSB 5078, this does not rise to the level of partiality present in *Soliz-Diaz*, because those feelings do not relate to the issues for which Judge Bashor maintains discretion after we order ESSB 5078 is constitutional, unlike the sentencing judge in *Soliz-Diaz*, whose feelings related to an issue for which he maintained significant discretion. Thus, we deny the State's request to reassign the case on remand.

CONCLUSION

We hold ESSB 5078 is constitutional under both the Washington and United States Constitutions. We reverse the superior court and remand for proceedings consistent with that order but deny the State's request for reassignment.

_____
Johnson, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Yu, J.

_____
Madsen, J.

_____
Montoya-Lewis, J.

_____
González, J.

_____

_____
Mungia, J.

No. 102940-3

GORDON McCLOUD, J. (dissenting)—The Second Amendment protects

the individual right to keep and bear arms. *N.Y. State Rifle & Pistol Ass'n, Inc. v.*

*Bruen*, 597 U.S. 1, 28, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022); *District of*

*Columbia v. Heller*, 554 U.S. 570, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008);

*McDonald v. City of Chicago*, 561 U.S. 742, 780, 130 S. Ct. 3020, 177 L. Ed. 2d

894 (2010) (plurality portion); U.S. CONST. amends. II, XIV (incorporating amend.

II). More specifically, it protects the right of law-abiding people[1] to keep and bear

arms "'in common use'"—not just arms that the government approves of.[2] And it

protects that conduct when it is done "for lawful purposes" including, but not

limited to, "self-defense"[3]—not just when it involves returning fire, as the State

seems to contend. Finally, the Second Amendment's protection of that conduct is

---

[1] *United States v. Rahimi*, 602 U.S. 680, 699, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (laws restricting possession of arms by "'felons or the mentally ill'" are "'presumptively lawful'" (quoting *Heller*, 554 U.S. at 626, 627 n.26)).

[2] *See Heller*, 554 U.S. at 624 (quoting *U.S. v. Miller*, 307 U.S. 174, 179, 59 S. Ct. 816, 83 L. Ed. 1206 (1939)), 628, 636.

[3] *Heller*, 554 U.S. at 582; *McDonald*, 561 U.S. at 780 (plurality portion).

1

the highest in "the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628; *McDonald*, 561 U.S. at 780 (plurality portion).

Engrossed Substitute Senate Bill 5078 (ESSB 5078),[4] which bans the manufacture, import, distribution, or sale of any firearm magazine capable of holding more than 10 rounds of ammunition,[5] even for self-defense inside the home, violates these constitutional protections.

Millions of law-abiding people have chosen semiautomatic firearms as the primary tool for lawful purposes such as self-defense in the home. *Heller*, 554 U.S. at 628-29; *McDonald*, 561 U.S. at 767-78. Millions of people have chosen to feed ammunition into those commonly used firearms with magazines capable of holding more than 10 rounds.[6] It necessarily follows that the Second Amendment protects the arms-bearing conduct at issue here, that is, keeping and bearing operable

---

[4] 67th Leg., Reg. Sess. (Wash. 2022).

[5] RCW 9.41.370(1), .010(25).

[6] "Although data are imprecise, experts estimate that approximately half of privately owned magazines hold more than ten rounds." *Duncan v. Bonta*, __ F.4th __ (9th Cir. 2025), 2025 WL 867583, at *4 (Mar. 20, 2025). "'Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds.'" *Id.* (quoting *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017)).

semiautomatic firearms with commonly used magazines for self-defense and other lawful purposes—including in the home.[7]

The State argues—and the majority agrees—that ESSB 5078 does not implicate "arms-bearing conduct" at all. They are incorrect. First, the State argues that magazines are not firearms because they're accessories or components, and accessories or components don't count for Second Amendment purposes. But the Second Amendment protects the conduct of bearing arms for self-defense and other lawful "purposes"—it does not just protect inanimate objects like firearms or magazines in isolation—and it is hard to imagine a semiautomatic firearm fulfilling its key purposes, including the purpose of self-defense, without a magazine. (The majority's suggestion that loading cartridges individually by hand "leav[es] the weapon fully functional for its intended purpose," majority at 15, betrays a misunderstanding of both "semiautomatic" and "self-defense.") Next, the State argues that magazines holding more than 10 cartridges might be in common use, but they are not in common use "for self-defense" because one limited, non-peer-

---

[7] The State argues that ESSB 5078 is not a "total ban" on large capacity magazines (LCMs) because it does not dispossess individuals of LCMs they owned before the law went into effect. But the law prevents any new LCMs from lawfully entering Washington. People who lawfully own LCMs now cannot replace them if they break. And no one can legally obtain a new LCM in the state. That certainly appears to effectively ban the purchase and use of LCMs in Washington.

reviewed study concluded that people fired an average of only 2.2 rounds in self-defense. 5 Clerk's Papers (CP) at 1510. But we don't measure whether an arm is in "common use" for "self-defense" or "other lawful purposes" by counting the number of rounds an "average" desperate victim is able to discharge when forced to return fire.

The only way for the State to avoid the conclusion that ESSB 5078 violates the Second Amendment is to show that similar laws from our nation's early history limited the right to bear arms in a similar way and for a similar reason—as the United States Supreme Court says, for a similar "how and why." *N.Y. State Rifle*, 597 U.S. at 29. The State fails to make this showing. Most of the laws it cites as supposedly similar regulate carrying, rather than banning a common arm completely (as ESSB 5078 does). Other laws the State cites as historical analogs are from the 1930s and later, well outside the time periods the United States Supreme Court has identified as relevant to this inquiry.

Finally, the State argues that we should view our nation's early limits on the right to keep and bear arms at an extremely high level of generality—so high that we characterize those old laws as barring weapons once society weighs their utility against their danger and decides that they are too dangerous. But that is precisely the sort of policy-laden interest-balancing that the United States Supreme Court

4

has explicitly barred under the Second Amendment. *Id.* at 22-23 (quoting *Heller*,

554 U.S. at 634; *McDonald*, 561 U.S. at 790-91 (plurality portion)). And it is the

sort of interest-balancing that repressive governments have historically used to

suppress opposition.[8]

---

[8] The repressive governmental practice of depriving disfavored groups of the ability to act in self-defense has a long and sordid history. The *Heller* Court summarized the long history of English rulers disarming dissidents and disfavored religious groups, including George III's attempts to disarm his political opponents in the American colonies. 554 U.S. at 594. And many early United States' laws restricted enslaved people from possessing firearms. Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336 n.129 (1991) (citing Act of Feb. 25, 1840, no. 20, § 1, 1840 Acts of Fla. 22-23; Act of Dec. 19, 1860, no. 64, § 1, 1860 Acts of Ga. 56; Act of Apr. 8, 1811, ch. 14, 1811 Laws of La. 50, 53-54; Act of Jan. 1, 1845, ch. 87, §§ 1, 2, 1845 Acts of N.C. 124). After the Civil War, "[m]any legislatures amended their laws prohibiting slaves from carrying firearms to apply the prohibition to free blacks as well." *McDonald*, 561 U.S. at 845-46 (Thomas, J., concurring in part) (footnote omitted) (citing Act of Dec. 23, 1833, § 7, 1833 Ga. Acts 226, 228; HERBERT APTHEKER, NAT TURNER'S SLAVE REBELLION 74-76, 83-94 (1966); Act of Mar. 15, 1852, ch. 206, 1852 Miss. Laws 328; Act of Jan. 31, 1831, 1831 Fla. Acts 30). American history is also filled with similarly racist gun control laws aimed at keeping arms out of the hands of Native Americans. *See, e.g.*, 1633 VA. CODE Act X; 1798 KY. ACTS § 106; 1850 UTAH LAWS 96, § 1; 1827 FLA. ACTS 46, § 1; 1835 MO. REV. STAT § 2; *see also* Ann E. Tweedy, *"Hostile Indian Tribes . . . Outlaws, Wolves, . . . Bears . . . Grizzlies and Things Like That?" How the Second Amendment and Supreme Court Precedent Target Tribal Self-Defense*, 13 U. PA. J. CONST. L. 687, 730 (2011) (discussing President Lincoln's 1865 Proclamation that "'all persons detected in that nefarious traffic [of furnishing hostile Indians with arms and munitions of war] shall be arrested and tried by court-martial at the nearest military post'" (alteration in original) (quoting Proclamation No. 28, 13 Stat. 753 (Mar. 17, 1865))). As late as 1925, Congress enacted a law barring the sale of arms or ammunition "'within any district or country occupied by uncivilized or hostile Indians,'" and it remained in force until 1953. *Id.* at 731 (citing 25 U.S.C. § 266 (1925-1926), *repealed by* 67 Stat. 590 (1953)). And in the 1930s, Nazis seized guns from Jews as part of their path to power. *See, e.g.*, Stephen P. Halbrook, *How the Nazis Used Gun Control*, NAT'L REV. (Dec. 2, 2013, 9:00 AM),

It necessarily follows that the Second Amendment protects the right of law-abiding individuals to keep and bear semiautomatic weapons equipped with magazines in common use for lawful purposes, especially in the home. The new state statute violates that Bill of Rights protection because it effectively bans all law-abiding individuals from acquiring and possessing an arm that is in common use for lawful purposes.

In a contest between a state statute and the United States Constitution, the judicial branch has the duty to uphold the Constitution. This is true even when the portion of the Constitution at issue is the Second Amendment.[9]

I therefore respectfully dissent.

I.      The Second Amendment Protects the Conduct of Keeping and Bearing Arms in Common Use for "Lawful Purposes Like Self Defense"

The Second Amendment provides, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear

---

https://www.nationalreview.com/2013/12/how-nazis-used-gun-control-stephen-p-halbrook/; Jon Greenberg, *Florida Lawmaker Mangles Nazi Gun Control History*, POLITIFACT (Mar. 6, 2018), https://www.politifact.com/factchecks/2018/mar/06/david-simmons/florida-lawmaker-mangles-nazis-gun-control-history/ [https://perma.cc/AQ4Y-FC44].

[9] ESSB 5078 also violates article I, section 24, as discussed in Part II *infra*.

arms, shall not be infringed." The Second Amendment codified a preexisting fundamental right held by "the people" that is "exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581. That right is fully incorporated against the states through the Fourteenth Amendment. *McDonald*, 561 U.S. at 779-80, 790 (plurality portion).

The specific right that the Second Amendment protects is the right of law-abiding individuals to keep and carry "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," as long as the arm is "'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 582, 624 (quoting *Miller*, 307 U.S. at 179); *see also McDonald*, 561 U.S. 780 (plurality portion) (the Second Amendment protects the "personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home"). "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *N.Y. State Rifle*, 597 U.S. at 28 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (per curiam) (Second Amendment protects right to keep and bear stun guns)).

Like most fundamental rights, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* For example, the Second Amendment does not protect the right to keep and bear arms that are "'dangerous *and* unusual.'" *Id.* at 627 (emphasis added) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *148). And it does not bar the government from restricting dangerous individuals from possessing arms. *United States v. Rahimi*, 602 U.S. 680, 699, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (quoting *Heller*, 554 U.S. at 626, 627 n.26). But, to reiterate, it *does* protect law-abiding individuals' right to keep and carry "all instruments that constitute bearable arms" that are "'in common use at the time' for lawful purposes like self-defense." *Heller* 554 U.S. at 582, 624 (quoting *Miller*, 307 U.S. at 179).

The United States Supreme Court recently reaffirmed these principles in *N.Y. State Rifle*, laying out the test that controls this case:

> When the Second Amendment's plain text covers an individual's *conduct*, the Constitution presumptively protects that *conduct*. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

597 U.S. at 24 (emphasis added).

8

We therefore begin with the rule that the Second Amendment presumptively protects "arms-bearing conduct," *Rahimi*, 602 U.S. at 691—that is, conduct relating to "bearable arms" that are "in common use" for lawful purposes including, but not limited to, self-defense. As discussed below, magazines that hold more than 10 rounds—what ESSB 5078 calls "large capacity magazines" (LCMs)—are bearable arms that are in common use for lawful purposes. Acquiring and using such arms therefore constitutes arms-bearing conduct presumptively protected by the Second Amendment. Because ESSB 5078 severely restricts this arms-bearing conduct, I would hold that the State has the burden to show that the regulation is consistent with the nation's history of firearms regulation—a burden that in this case, the State fails to meet.

A. Magazines, including LCMs, are "bearable arms"

ESSB 5078, enacted in 2022, provides, "No person in this state may manufacture, import, distribute, sell, or offer for sale any [LCM]," with certain exceptions for law enforcement and military purposes. RCW 9.41.370(1). According to that law, an LCM is "an ammunition feeding device with the capacity to accept more than 10 rounds of ammunition." RCW 9.41.010(25).

A "repeating firearm" is a firearm that is capable of firing multiple rounds of ammunition without manual reloading.[10] In order to fire multiple rounds without reloading, a repeating firearm uses a "magazine," which is "a device that automatically feeds ammunition into a firearm whenever the shooter fires a bullet." *Duncan v. Bonta*, __ F.4th __ (9th Cir. 2025), 2025 WL 867583, at *4. Thus, a magazine is not an optional accessory for a repeating firearm. It is a defining characteristic of a repeating firearm. As Gator's Custom Guns[11] explains, "Without a magazine inserted, a semiautomatic weapon will not function properly" and is "essentially a single shot breechloader" like an old-fashioned musket. Resp'ts' Br. at 51, 54. And because the magazine functions as an ammunition *feeding* device, it is not just a passive receptacle for storing ammunition like a cartridge box.[12]

---

[10] Repeating firearms include weapons like manually operated repeating rifles or shotguns, in which the user must perform a manual operation like pulling back a bolt to eject spent shells and reload, as well as semiautomatic weapons, which are capable of reloading the weapon automatically after each pull of the trigger. *See, e.g.*, FIREARMS: AN ILLUSTRATED HISTORY (D.K. Publ'g 2014).

[11] Respondents Gator's Custom Guns Inc. and its owner, Walter Wentz.

[12] The State argues that a magazine is analogous to a Revolutionary-War-era "cartridge box," which was a container worn on the body that held individual rounds of ammunition that the user would manually load into a firearm. Appellant's Br. at 46-47 (citing 4 CP at 1412 (expert report of Dennis Baron, PhD)); *see also* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 254 (2024). According to the State, cartridge boxes were historically considered accessories, not arms, so at the time of the nation's founding, a magazine would have

Thus, magazines, including what ESSB 5078 defines as "LCMs," fall squarely within *Heller*'s definition of "arms" as "'any thing that a [person] wears for [their] defence, or takes into [their] hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581 (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)). A magazine is essential to a user's ability to use a repeating firearm "to cast at or strike another" in the manner it was designed to do.

The State argues that LCMs are not "bearable arms" because, while semiautomatic weapons require some kind of magazine to function as intended, no semiautomatic weapon specifically requires an LCM to function. Appellant's Br. at 49. But that is irrelevant: "under [*N.Y. State Rifle*], a 'modern instrument[] that *facilitate*[*s*][13] armed self-defense' is an arm entitled to the 'prima facie' protection of the Second Amendment." *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d

---

been considered an accessory, not an arm. Appellant's Br. at 46-47. This argument relies on a fundamental misunderstanding of a magazine's function. Like a cartridge box, a magazine stores ammunition. But unlike a cartridge box, a magazine is not just an inert container for ammunition: as described above, it uses a spring or other mechanism to feed rounds of ammunition into the gun's firing chamber. It is an integral part of the firearm, like a trigger or a grip. Thus, a cartridge box is not a persuasive "historical analogue" to a magazine. 4 CP at 1417.

[13] "Facilitate" means "to make easier or less difficult **:** free from difficulty or impediment." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 812 (1993).

11

63, 94 (D. Conn. 2023) (most alterations in original) (emphasis added) (quoting *N.Y. State Rifle*, 597 U.S. at 28 (citing *Caetano*, 577 U.S. at 411-12)). An LCM—like all magazines—is incontrovertibly an instrument[14] that "facilitates armed self-defense" because it supplies ammunition to a repeating firearm so that the firearm functions as intended.

And, critically, the Second Amendment does not just protect "arms"—it protects "arms-bearing conduct." So it protects the right to purchase arms and ammunition and the right to access gun ranges to maintain proficiency in firearm use. *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (citing *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014)); *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (right to purchase ammunition); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (right to access gun ranges); *see also Miller*, 307 U.S. at 179-80 (recognizing that "'[t]he possession of arms also implied the possession of ammunition'" (quoting 1 HERBERT L. OSGOOD, THE AMERICAN COLONIES IN THE SEVENTEENTH CENTURY (1904))).

---

[14] "Instrument" means "**1 a :** a means whereby something is achieved, performed, or furthered . . . . **2 :** UTENSIL, IMPLEMENT." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1172 (1993).

The reason is that if law-abiding people cannot obtain a firearm, an integral component of a firearm, or ammunition, or practice with firearms, then "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much.'" *Teixeira*, 873 F.3d at 677 (quoting *Ezell*, 651 F.3d at 704). Thus, as numerous courts have found, the Second Amendment also protects acquisition and possession of magazines, including LCMs. *Nat'l Ass'n for Gun Rts.*, 685 F. Supp. 3d at 94 ("LCMs are 'arms' for purposes of the Second Amendment as defined in [*N.Y. State Rifle*] and *Heller*."). For example, in a case like this, which also involved a bar on LCMs, the Third Circuit Court of Appeals reasoned that because "magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) (citing *Jackson*, 746 F.3d 953).[15]

And, as the United States Court of Appeals for the District of Columbia explained in another LCM ban case, "A magazine is necessary to make meaningful

---

[15] Some of the federal cases cited above applied a pre-*N.Y. State Rifle* analysis that first asked if the regulation infringed on the right to keep and bear arms, then applied an interest-balancing test to determine if the regulation was constitutional. *N.Y. State Rifle* forbade the use of such interest-balancing tests when evaluating Second Amendment rights. Thus, those portions of the opinions are no longer good law. But *N.Y. State Rifle* did not disturb the portions of those opinions determining whether a regulation implicated the Second Amendment in the first instance.

an individual's right to carry a handgun for self-defense. To hold otherwise would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level, 'such as a firing pin.'" *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024) (reviewing injunction and affirming district court's ruling that party challenging LCM ban would very likely succeed at showing that LCMs are Second Amendment arms) (quoting *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *rev'd en banc*, 849 F.3d 114 (4th Cir. 2017)). ESSB 5078 is just such an attempt at sidestepping the Second Amendment with "a regulation prohibiting possession at the component level."

The State concedes that "it is possible that a restriction on *all* magazines would infringe on the right to bear arms because it would make the weapons that rely on them unusable." Appellant's Br. at 49. But it continues that a restriction on LCMs does not regulate conduct within the scope of the Second Amendment because such magazines "are not necessary for *any* weapon to fire exactly as intended." *Id.*

The State's reasoning conflicts with controlling United States Supreme Court precedent. *Heller* holds, "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that

14

the American people have considered the handgun to be the quintessential self-defense weapon." 554 U.S. at 629. Following *Heller*'s logic, the State cannot place an arbitrary ban on magazines with a certain capacity just because magazines with lesser capacities are still allowed. *See also Jackson*, 746 F.3d at 967 (law banning one *type* of bullet regulated conduct within the scope of the Second Amendment because bullets *in general* are necessary to "use firearms for their core purpose," even though law did not affect legality of other types of bullets).

The majority adds that an LCM falls outside the definition of "arm" because it "does not cast the round, but feeds the round into the firearm." Majority at 10. Well, the grip, trigger, and receiver don't "cast" the round either (the force from the explosion of the primer and ignition of the propellant does). So examining individual components of a firearm as the majority does leads to the absurd result that the government can ban triggers, grips, receivers, or firing pins because none of those integral components, in isolation, are capable of "cast[ing]" ammunition at a target, either.[16] That can't be right. It conflicts with the logic of *Heller* because it

---

[16] The majority notes that Congress did not include magazines in its definition of "firearms" in the Gun Control Act of 1968, 18 U.S.C. § 921(a)(3). Majority at 11 n.7. But an act of Congress can't change the meaning of the Constitution. And even if it could, that act of Congress recognizes that certain components of firearms can themselves be considered firearms: if an optional silencer can be considered a firearm, then certainly a necessary magazine can too. *See* 18 U.S.C. § 921(a)(3)(C).

ignores the fact that a firearm requires each of its core component parts to function as intended. And it conflicts with the logic of *N.Y. State Rifle*, because that decision made clear that the Second Amendment protects anything that "facilitate[s] armed self-defense," 597 U.S. at 28, and magazines of all sorts, standard as well as what ESSB 5078 calls "large," certainly do that. (The majority does not even mention this definition of "arms" from *N.Y. State Rifle*.)

The majority also confuses the definitions of "arm" under state and federal law. It is true that in *City of Seattle v. Evans*, we held that article I, section 24's right to bear arms was limited to "instruments that are designed as weapons traditionally or commonly used by law-abiding citizens for the lawful purpose of self-defense." 184 Wn.2d 856, 869, 366 P.3d 906 (2015). But this definition of protected "arms" from *Evans* differs from the definition of protected "arms" under the Second Amendment precedent discussed above. Most notably, the United States Supreme Court has never held that an instrument must be "designed as a weapon" to enjoy Second Amendment protection. But the majority appears to hold that the fact that so-called LCMs "are not designed for use as a weapon themselves" means that they can't be considered weapons by the United States

16

Supreme Court. Majority at 11.[17] That's not logical. This court can look to Second Amendment precedent to interpret our state constitutional right to bear arms; but United States Supreme Court precedent—not our *Evans* decision—controls the meaning of arms under the Second Amendment.[18]

The result, under controlling Supreme Court precedent, is that magazines, including LCMs, are "bearable arms."

---

[17] Further, the *Evans* definition seems broader than the Second Amendment definition to the extent that it protects weapons that are either "traditionally *or* commonly*" used in self-defense. 184 Wn.2d at 869 (emphasis added). *Heller* and *N.Y. State Rifle* seem to require that an arm be "in common use" at the present time—in other words, not "dangerous and unusual" at the present time—to qualify for Second Amendment protection. *E.g.*, *N.Y. State Rifle*, 597 U.S. at 47 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today.").

[18] The majority states that because this court has interpreted our state constitutional right to bear arms using United States Supreme Court Second Amendment precedent as guidance, it follows that "an 'arm' under article I, section 24 must be an 'arm' under the Second Amendment *and vice versa*." Majority at 5 (emphasis added). This is a logical fallacy akin to saying that because all squares are rectangles, all rectangles must also be squares. *See* RUGGERO J. ALDISERT, LOGIC FOR LAWYERS: A GUIDE TO CLEAR LEGAL THINKING 220 (2012) (ebook). While this court is free to model our state constitutional analysis on Second Amendment precedent, as a matter of logic and the supremacy clause, it does not follow that Second Amendment precedent must follow our court's analysis. U.S. CONST. art. VI, cl. 2.

17

B. LCMs are commonly used for lawful purposes including self-
defense

As stated, "the Second Amendment protects the possession and use of

weapons that are "'in common use at the time'""" for lawful purposes including, but

not limited to, self-defense. *N.Y. State Rifle*, 597 U.S. at 21 (quoting *Heller*, 554

U.S. at 627 (quoting *Miller*, 307 U.S. at 179)).[19] As courts across the country have

found, magazines with a capacity of more than 10 rounds are very commonly

possessed by law-abiding Americans. "Although data are imprecise, experts

estimate that approximately half of privately owned magazines hold more than ten

rounds." *Duncan*, 2025 WL 867583, at *4. "'Most pistols are manufactured with

magazines holding ten to seventeen rounds, and many popular rifles are

manufactured with magazines holding twenty or thirty rounds.'" *Id.* (quoting

*Kolbe*, 849 F.3d at 129).

In other words, "[t]here may well be some capacity above which magazines

are not in common use but . . . that capacity surely is not ten." *Heller v. District of*

---

[19] The majority errs by stating that the Second Amendment "protect[s] only those arms that are commonly used for self-defense." Majority at 12. While "self-defense is 'the *central component* of the [Second Amendment] right,'" it is not the only component. *N.Y. State Rifle*, 597 U.S. at 32-33 (alteration in original) (quoting *Heller*, 554 U.S. at 599, and citing *McDonald*, 561 U.S. at 767). *Heller* refers to the right to keep and bear arms for "traditionally lawful purposes, *such as* self-defense within the home." 554 U.S. at 577 (emphasis added).

18

*Columbia*, 399 U. S. App. D.C. 314, 670 F.3d 1244, 1261 (2011) (*Heller* II); *see*

*also N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir.

2015) ("Even accepting the most conservative estimates cited by the parties and by

amici, the . . . [LCMs] at issue are 'in common use' as that term was used in

*Heller*.");[20] David B. Kopel, *The History of Firearm Magazines and Magazine*

*Prohibitions*, 78 ALB. L. REV. 849, 859 (2015) ("The most popular rifle in

American history is the AR-15 platform, a semiautomatic rifle with standard

magazines of twenty or thirty rounds.").

It necessarily follows that the Second Amendment protects the conduct at

issue here: keeping and bearing semiautomatic firearms equipped with a

commonly used magazine. A firearm with an LCM is in the same category as a

firearm with a smaller capacity magazine because it is in common use for self-

defense or other lawful purposes.

---

[20] While the superior court appeared to sustain the State's hearsay objection to Gator's evidence about the number of LCMs in circulation, the superior court also found that "the many cases related to LCMs cited by counsel and this Court's case law review yields [the conclusion that LCMs] are extremely widespread in civilian hands." 6 CP at 2111, 2137. As cited above, my review of the same case law produces the same conclusion.

C. The State's arguments to the contrary flout precedent and logic

The State argues that even if LCMs are commonly *possessed* by law-abiding Americans, they are not widely "used" for self-defense. This argument fails for several reasons.

The first problem with the State's argument is that as mentioned, the Second Amendment does not exclusively protect the right to keep and bear arms in self-defense. *Heller*, 554 U.S. at 599. It covers the right to keep and bear arms "in common use" for other "lawful purposes" including hunting, target practice, and the like. *Id.*

The second problem with the State's argument is that its definition of the word "use" defies common sense. The State acknowledges that "guns can be used in self-defense without any shots being fired." Appellant's Br. at 32. The State undermines this acknowledgment by going on to assert that LCMs are not commonly "used" for self-defense because, it alleges, individuals are rarely forced to fire more than 10 rounds in self-defense. *Id.* at 32, 52. The State contends that the average number of shots that an individual fires in self-defense is 2.2. *Id.* at 31 (citing 5 CP at 1510 (expert report of Lucy P. Allen)).

Under the State's argument, unless a user fires 10 or more rounds, she has not "used" a firearm equipped with an LCM for self-defense. But as discussed

20

above, keeping and bearing a firearm for self-defense covers a lot more than returning fire (even if the State's 2.2 shots statistic were trustworthy, which is debatable).[21] It covers storing, training, teaching, practicing, and keeping a home prepared. The State's argument—that the average number of shots fired in self-defense determines whether LCMs are in common "use" for self-defense—contradicts *Heller*, which held that the Second Amendment protects arms that are "typically *possessed*" for "lawful purposes." 554 U.S. at 625 (emphasis added); *see also id.* at 629 ("point[ing]" a gun at a burglar is one way that handguns can be used in self-defense). And when describing the historical understanding of the right to keep and bear arms, *McDonald* said "the right was also valued because the *possession* of firearms was thought to be *essential* for self-defense." 561 U.S. at 787 (plurality portion) (emphasis added); *see also N.Y. State Rifle*, 597 U.S. at 32

---

[21] Even if the average number of shots fired were relevant to the determination of whether a firearm is in common use for self-defense, the study the State relies on has some significant shortcomings. First, it is not peer-reviewed research. Second, to determine "average number of shots fired in self-defense," the report relies on a small sample of about 1,000 national news stories from the limited time period of 2011-2017. It is unclear why that time period was selected, as the report itself makes clear that more recent data about self-defense incidents is publicly available. 5 CP at 1510 nn.4, 5. Where a news story did not specify number of shots fired, the researcher "used the average for the most relevant incidents with known number of shots"; it is unclear what metric was used to determine "relevant incidents." *Id.* at 1510 n.7. (The study also examines shooting-related police reports from Portland, Oregon between 2019-2022, but it apparently did not use that data to perform its "average shots fired in self-defense" calculation. *Id.* at 1521.)

("[I]ndividuals often 'keep' firearms in their home, *at the ready* for self-defense." (emphasis added)). Similarly, in *Caetano*, the Court reversed, on Second Amendment grounds, the petitioner's conviction for violating a state law forbidding possession of stun guns. 577 U.S. 411. The *Caetano* Court's decision did not depend on how frequently stun gun owners fire in a self-defense scenario— no such statistic was even mentioned. Rather, as the concurrence explained, the petitioner in *Caetano* had done no more than "display[]" her stun gun to ward off an attacker. *Id.* at 413 (Alito, J., concurring); *accord Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 921 (D. Or. 2023) ("[T]his Court agrees, that an individual need not fire a gun to use it for self-defense.").

The State continues that firearms equipped with LCMs "have virtually no utility for self-defense" *because* they are capable of firing more than 10 rounds. Appellant's Br. at 30 (citing *Duncan v. Bonta*, 19 F.4th 1087, 1104-05 (9th Cir. 2021)). It even asserts that such a weapon is "disadvantageous for self-defense." *Id.* at 9 (emphasis omitted). It is hard to understand why having additional ammunition at the ready would make it harder for a frightened victim to act in self-defense.

But even if the State's assertion were true, it is irrelevant. It amounts to an argument that the State alone gets to select the arms that individuals can use for

self-defense and other lawful purposes. But the Second Amendment doesn't protect the right of the State to choose the best arm for self-defense; it protects the right of the individual to make that choice. So despite what the State prefers, under *Heller*'s "in common use" test, the popularity of an arm among the law-abiding public actually determines whether that arm enjoys Second Amendment protection. *Cf.* Appellant's Br. at 35 (decrying the superior court's application of the "in common use" test as "a misguided popularity-contest approach"). As the Supreme Court explained in *McDonald*, *Heller* held that the Second Amendment applies to handguns "because they are 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family.'" 561 U.S. at 767-68 (quoting *Heller*, 554 U.S. at 628-29). Even the *Heller* dissent agreed that this was *Heller*'s holding—as Justice Stevens acknowledged, "The [*Heller*] Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose." *McDonald*, 561 U.S. at 890 n.33 (Stevens, J., dissenting).

The majority does not adopt the State's argument that a gun equipped with an LCM must actually be fired more than 10 times to be "used" for self-defense. However, it rejects Gator's evidence about the large number of LCMs that Americans lawfully own as irrelevant to the question of whether such magazines

are in common use for self-defense. Majority at 12. It does not mention that according to one survey cited by Gator's, "approximately 48% of gun owners (39 million individuals) have owned magazines that hold more than 10 rounds, and 71% of such owners indicate that they have owned such magazines for defensive purposes (Home Defense or Defense Outside the Home)." William English, *2021 National Firearms Survey: Analysis of Magazine Ownership and Use*, abstract (Georgetown McDonough Sch. of Bus., Research Paper No. 4444288, 2023); Resp'ts' Br. at 56. The majority does not explain what kind of evidence it thinks would suffice to show that an arm is in common use for self-defense. (And again, like the State, the majority erroneously states that self-defense is the only conduct protected by the Second Amendment.) Given the indisputable fact that LCMs are lawfully owned in the millions, it is more reasonable to conclude that they are in common use for one of the many lawful purposes protected by the Second Amendment—purposes including self-defense, training, hunting, and sports. Under *Heller*, such widespread lawful possession of an arm supports the conclusion that the arm is in common use for lawful purposes. *See* 554 U.S. at 629.

The State and majority's approach is backward—instead of starting with the presumption that arms-bearing conduct is protected, *N.Y. State Rifle*, 597 U.S. at 24, they seem to start with the presumption that the State can regulate anything

24

relating to arms at all and that the burden is on the challenger to show why the State can't do that. Under that logic, if the Second Amendment permits the State to select the right magazine capacity for users, despite the fact that magazines of greater capacity are "in common use" in the millions, the State would not have to stop at a 10 round limit. It could adopt magazine capacity limits of 9, or 5, or even 2 rounds.[22] In fact, if the State can classify firearm components as unprotected accessories, then the State could completely bar modern weapons and force the people to use outdated, poor-performing, less accurate versions of those components.

The Second Amendment does not allow that result. Controlling precedent makes clear that the fundamental right protected by the Second Amendment is the individual's right to keep and bear arms of one's choosing, including magazines, as long as those arms are in common use for self-defense or other lawful purposes. This precedent compels the conclusion that a regulation on firearm magazines that

---

[22] Under the majority's logic, the State could probably adopt a total ban on magazines. According to the majority, a magazine is not an integral component of a semiautomatic firearm because "a semiautomatic firearm is still capable of firing" without one—if only by loading manually and shooting one round at a time. Majority at 15. In the majority's view, using a semiautomatic weapon as a single-shot weapon would still "fulfill[] the firearm's purpose as a tool for realizing the core right of self-defense" and would "leav[e] the weapon fully functional for its intended purpose." *Id.* As mentioned, this position shows a fundamental misunderstanding of both "semiautomatic" and "self-defense."

are capable of holding over 10 rounds constitutes a regulation on common, lawful, "arms-bearing conduct." That means that the State must prove that ESSB 5078 has a sufficiently similar historical analog to survive.

II.     The State Fails To Identify a Historical Analog To Banning Magazines Capable of Holding over Ten Rounds

If a regulation covers conduct protected by the Second Amendment, then the State bears the burden of showing that the regulation is "consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle*, 597 U.S. at 24. A historical analog need not be a "historical *twin*." *Id.* at 30. To determine if a historical law and a modern law are analogous, we must compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. If the "how" or the "why" are different, then the old law is not a historical analog of the new restriction.

"'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Id.* at 34 (emphasis omitted) (quoting *Heller*, 554 U.S. at 634-35). Thus, the laws that are most relevant for deciding whether ESSB 5078 has an historical analog are the laws from around the time that the Second and Fourteenth Amendments were ratified. *Id.* at 34-35. Laws that long

26

pre- or postdate those time periods are not particularly relevant to this historical analog inquiry. *Id.*

The State fails to meet its burden of identifying such a relevant historical analog. This is because there is no relevant historical analog for regulating the ammunition capacity of firearms. As Gator's points out, the only founding-era laws addressing the quantity of ammunition the people could possess were laws requiring *minimum* quantities of ammunition that "able-bodied men" had to own for use in militia service. Resp'ts' Br. at 64 (citing *Miller*, 307 U.S. 179-82).

And undisputed evidence shows that the first laws restricting magazine capacity were enacted in the Prohibition era—about 150 years after the founding period. Appellant's Br. at 67-68; Resp'ts' Br. at 74; Kopel, *supra*, at 864; *accord Heller* II, 670 F.3d at 1260 ("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity.").

The State instead falls back to the argument that ESSB 5078 fits within "a well-established tradition of regulating dangerous weapons when their proliferation leads to widespread societal problems." Appellant's Br. at 59. It cites various laws regulating trap guns and bludgeoning instruments dating from the time of the nation's founding and laws banning Bowie knives and concealed carry of pistols

27

beginning in the 1830s. It also cites the Prohibition-era laws regulating semiautomatic and automatic firearms. The State argues that these laws are historical analogs for ESSB 5078 because legislatures justified them for the same reason: limiting dangerous weapons.

To be sure, the State does not have to find an identical historical law to prove that the current law is consistent with the nation's history of firearms regulation. *N.Y. State Rifle*, 597 U.S. at 24; *Rahimi*, 602 U.S. at 691-92. But most of the laws cited by the State did not regulate arms possession the way ESSB 5078 does—by outlawing acquisition of a particular weapon in common use. Thus, such laws lack a shared "how" with ESSB 5078.

For example, the State cites founding-era laws that barred people from setting trap guns. But those laws regulated one particular use of a gun—they did not ban the gun itself. *See* 5 CP at 1609-10 (trap guns were created "by rigging the firearm to be fired with a string or wire which then discharged when tripped" (expert report of Robert J. Spitzer, PhD)). The State cites pistol regulations from the mid- to late 1800s. But most of those regulations imposed a tax or banned concealed carry—they did not ban acquisition or possession. Appellant's Br. at 66. And the State cites laws relating to Bowie knives. But most of those laws created carrying restrictions or taxes, too. *Id.* at 63.

The State cites only two state laws that "entirely banned the sale or possession" of an arm, and that arm was the Bowie knife. *Id.* But *N.Y. State Rifle* "doubt[ed] that *three*…regulations could suffice to show a tradition" of arms regulation. 597 U.S. at 46. So two probably can't, either.

And as for the State's citations to Prohibition-era regulations of automatic and semiautomatic weapons, those regulations occurred far beyond the relevant time period for *N.Y. State Rifle*'s historical inquiry.

The State essentially argues that we should pull back to the highest possible level of generality about the specific historical limitations on keeping and bearing firearms, and sums up those historical limitations as "society can ban dangerous things." There are several problems with using the abstract concept of "danger" to justify limitations on people's access to weapons for self-defense and other lawful purposes: (1) all firearms are dangerous, especially if they're equipped with magazines—that's their purpose, (2) that level of generality allows legislatures to limit the reach of the United States Constitution based on balancing society's interest against the individual's right, and that violates the *Heller-N.Y. State Rifle* directive against interest-balancing in the Second Amendment context, and (3) it is the process that repressive governments have historically used to suppress dissent. *See supra* n.8. Indeed, the *Heller* Court identified the founders' fear of such

29

repression as one of the reasons for the adoption of the Second Amendment. 554

U.S. at 594.

In sum, magazines, including LCMs, are "bearable arms" in common use, so

they are presumptively protected by the Second Amendment. And in this case, the

State fails to show that ESSB 5078's restriction on magazine capacity comports

with our nation's historical tradition of firearm restriction. I would therefore affirm

the superior court's decision holding that ESSB 5078 violates the Second

Amendment.

III. The State Constitution Was Always Considered More Protective of the Individual Right To Bear Arms Than the Federal Constitution; *Jorgensen* Replaced That Historical Understanding with Judicial Interest-Balancing; Under *Jorgensen*'s Interest Balancing Test, the Challenged Law Probably Survives; But *Jorgensen* Erred in Overruling Prior Case Law on This Topic

Article I, section 24 of the Washington Constitution provides:

The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

The firearm rights protected by article I, section 24 are "fundamental." *State*

*v. Sieyes*, 168 Wn.2d 276, 287, 225 P.3d 995 (2010). The rights are "distinct from

those guaranteed by the United States Constitution," *State v. Jorgenson*, 179

Wn.2d 145, 153, 312 P.3d 960 (2013), because article I, section 24's language is

"facially broader than the Second Amendment" in several ways. *State v. Rupe*, 101 Wn.2d 664, 706, 683 P.2d 571 (1984). First, article I, section 24 specifies that the right to bear arms is an individual right. Second, article I, section 24 explicitly protects the right to bear arms for two specific purposes: self-defense and defense of the state. "We are not at liberty to disregard this text" because the provisions of our constitution "'are mandatory, unless by express words they are declared to be otherwise.'" *Sieyes*, 168 Wn.2d at 293 (quoting WASH. CONST. art. I, § 29).

The majority erroneously characterizes article I, section 24 as protecting only the right to bear arms in self-defense. Majority at 12 ("LCMs also fall outside either protection of the right to bear arms because the provisions protect only those arms that are commonly used for self-defense . . . ."), 13 (holding that LCMs are "not within the scope of the rights to bear arms under the Washington and United States Constitutions" because there is no evidence that LCMs are "commonly used for self-defense"). But that contradicts the plain text of article I, section 24—it renders section 24's words "or the state" meaningless. That's not how we interpret the constitution. *State ex rel. Heavey v. Murphy*, 138 Wn.2d 800, 811, 982 P.2d 611 (1999) ("[C]onstitutional provisions should be construed so that no portion is rendered superfluous.").

31

Despite *Sieye*'s recognition that article I, section 24 protects a fundamental right, just a few years later this court held that a freestanding interest-balancing test applies to determine whether a law violates that constitutional right. In *Jorgenson*, we said that when analyzing a law implicating article I, section 24, courts must apply a form of intermediate scrutiny and "'balanc[e] the public benefit from the regulation against the degree to which it frustrates the purpose of the constitutional provision.'" 179 Wn.2d at 156 (alteration in original) (quoting *City of Seattle v. Montana*, 129 Wn.2d 583, 594, 919 P.2d 1218 (1996), *overruled in part on other grounds by Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019)). Under *Jorgenson*'s weak intermediate scrutiny test, ESSB 5078 probably survives.

But in my view, *Jorgenson* erred on this point. "State interference with a fundamental right is subject to strict scrutiny." *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 220, 143 P.3d 571 (2006) (citing *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005)), *overruled in part on other grounds by Yim*, 194 Wn.2d 682; *Sieyes*, 168 Wn.2d at 303 n.32 (J.M. Johnson, J., concurring and dissenting in part) (strict scrutiny applies to the rights to marry and parent) (citing *State v. Warren*, 165 Wn.2d 17, 34, 195 P.3d 940 (2008)); *First United Methodist Church v. Hearing Exam'r*, 129 Wn.2d 238, 249, 916 P.2d 374 (1996) (same with respect to the free exercise of religion); *In re Juveniles A, B, C,*

*D, E*, 121 Wn.2d 80, 97-98, 847 P.2d 455 (1993) (same with respect to the right to privacy)).

Just like the fundamental rights protected by the Bill of Rights, our state constitution does "not recognize a hierarchy of constitutional rights; the fact that a right is enumerated renders it fundamental and elevates it above all nonfundamental interests." *Jorgenson*, 179 Wn.2d at 171 (Wiggins, J., dissenting) (citing *Heller*, 554 U.S. at 634; *Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)). The State identifies no other fundamental right that is subject to a standard as lax as the standard *Jorgenson* applies to article I, section 24. Had any party argued that we should overrule *Jorgenson* as incorrect and harmful, I would agree. But no party did so, and we remain bound by that decision.

## CONCLUSION

Magazines, including magazines capable of holding over 10 rounds, constitute Second Amendment "arms" as defined in *Heller* and *N.Y. State Rifle*. They are also arms in common use for lawful purposes, including self-defense. ESSB 5078 regulates the "arms-bearing conduct" of possessing and using such arms; it therefore regulates conduct that is presumptively protected by the Second Amendment. The State fails to meet its burden to show that this new law is

consistent with our nation's history of firearms regulations, as *N.Y. State Rifle*

requires. ESSB 5078 therefore violates the Second Amendment, as the trial court

held. Unlike the majority, I would affirm that trial court decision.

I therefore respectfully dissent.

Gordon McCloud, J.

Whitener, J.

34